AFSCME LOCAL 2477, et al.,
Plaintiffs,

v.

James H. BILLINGTON, in his official
capacity as Librarian of
Congress, Defendant.

Civ. A. No. 88–3069–OG.

United States District Court,
District of Columbia.

May 2, 1990.

**2**

Karen A. Tramontano, Martin & Tramontano, Washington, D.C., for plaintiffs.

Daniel Bensing, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GASCH, District Judge.

In this action plaintiffs challenge a Library of Congress regulation that permits Library of Congress employees, under certain emergency circumstances, to be placed on enforced leave or suspension from work without a prior administrative hearing. Plaintiffs allege that this regulation violates fifth amendment procedural due process and the first amendment. Before the Court are the parties' cross-motions for summary judgment. Upon consideration of the parties' positions and the relevant law, the Court concludes that the regulation is valid under both the fifth and first amendments. Accordingly, the Court grants summary judgment for defendant.

## I. BACKGROUND

Plaintiffs are the American Federation of State, County and Municipal Employees ("AFSCME") Local 2477, a labor organization representing non-professional employees at the Library of Congress, and AFSCME Local 2910, a labor organization representing the Library's professional employees. Defendant James Billington is the Librarian of Congress, sued solely in his official capacity.

At issue is Library of Congress Regulation 2020–5 ("LCR 2020–5"), entitled "Enforced Leave and Suspension," which establishes the Library's policy for placing a staff member on enforced leave in "emergency situations." The regulation states, in relevant part:

A. In certain emergency situations requiring prompt action, a staff member may be placed on administrative leave not to exceed five work days, followed by enforced annual or sick leave as appropriate or, in the absence of annual or sick leave, on suspension. . . .

B. Emergency situations exist, and action under this Section may be taken when circumstances are such that the retention of the staff member in an active duty status may result in

(1) injury to the staff member, other staff members, or the general public;

(2) acts or behavior, caused by illness or misconduct, which may be detrimental to the Library's operations, the interest of Government, or the staff member;

(3) damage to Library property.

LCR 2020–5 §§ 2A, 2B, attached at Exhibit A to Defendant's Motion for Summary Judgment.

In practice, when a supervisor concludes that action under this regulation is warranted, a Library employee may be placed on administrative leave for up to five days, with no reduction in salary. Thereafter, the employee may be placed on enforced annual or sick leave, as appropriate. If the employee has no accumulated annual or sick leave, he may be suspended without pay. The employee remains on leave until the Library can determine either that the employee is ready, willing, and able to resume work, or that the employee's presence no longer constitutes a danger to the Library or its staff. Deposition of Leonard Scott ("Scott Depo.") at 11–12, 19–21.

Since plaintiffs claim that the procedures outlined in LCR 2020–5 are unconstitutional, it is necessary to describe those procedures in some detail. By the terms of the regulation, an employee's supervisor, after consultation with the Office of the Counsel for Personnel, may immediately place an employee on administrative leave upon finding that an emergency situation exists. LCR 2020–5 § 3B. No prior hearing is required. Shortly thereafter, a letter is written to the employee by the Director of Personnel. *See id.* § 4B. The letter de-

scribes the incident or conduct precipitating the enforced leave, and informs the employee of the beginning and ending dates of his administrative leave and of the proposed action in his case. The letter also informs the employee of his opportunity to reply in writing to the proposed action, his right to retain the assistance of a representative, and his right to appeal should the proposed action be approved. Finally, the letter apprises the employee of whether he has been barred from entering the Library unless accompanied by security personnel. *See id.* Due to time constraints, the letter is usually read to the employee over the phone by his second day of administrative leave. During the phone conversation, the employee is given an opportunity to present his side of the story. Scott Depo. 11–12, 18.

By the second or third day of the employee's administrative leave, a meeting is held by Library officials to discuss the matter. Statements from witnesses are received and the employee's explanation of the incident, if any, is considered. *Id.* at 13–14. Within the five-day period of administrative leave, the Director of Personnel decides whether continued suspension from work is appropriate. If the Director determines that continued suspension is not appropriate, the employee resumes his job. *Id.*

If the Director determines that continued suspension is appropriate—because the Director finds that one of the harms identified in the regulation would likely recur should the employee return to work—the employee is placed on enforced leave. In that case, a second letter to the employee is prepared, informing him of this action and of his right to appeal within 10 days of his receipt of the letter. *See* LCR 2020–5 § 4D. Thereafter, the Library's senior staff relations specialist, Leonard Scott, conducts an investigation of the matter to determine whether disciplinary measures are warranted under the circumstances, and reports his findings and recommendations to the Director of Personnel. *See id.* § 4C. Any disciplinary measures that fol-

low are distinct from the proceedings under LCR 2020–5, and are subject to the full evidentiary hearing requirements of LCR 2020–3 ("Policies and Procedures Governing Adverse Actions"), attached at Exhibit E to Defendant's Motion for Summary Judgment.[1]

If the employee decides to appeal the decision placing him on enforced leave, a hearing before a senior Library official is conducted within 30 days of receiving the employee's notice of appeal. LCR 2020–5 § 4D. The hearing is not an on-the-record proceeding. However, the affected employee is entitled to be accompanied by counsel or other representative. A written decision is issued shortly after the hearing, usually within two weeks. There is no formal avenue of appeal from this decision, short of a challenge in federal court.

## II. DISCUSSION

### A. *Procedural Due Process*

Plaintiffs allege that LCR 2020–5 provides inadequate procedures in violation of fifth amendment due process. Complaint ¶¶ 15–18. The gravamen of plaintiffs' complaint is that LCR 2020–5 violates the fifth amendment because it provides an employee with no opportunity for a full evidentiary hearing either prior to or after being placed on enforced administrative leave.

The framework for due process analysis in cases such as this is well settled. The analysis involves a two-pronged inquiry. First, the Court must determine whether due process applies at all—that is, whether the deprivation of "life, liberty, or property" is at stake. Second, the Court must determine whether the procedures provided are constitutionally adequate. This determination is made by weighing (1) the nature of the interest affected, (2) the risk of an erroneous deprivation of that interest through the procedures in place, and (3) the fiscal and administrative burdens that might be encountered should more elaborate procedures be required. *Goldberg v. Kelly*, 397 U.S. 254, 262–63, 90 S.Ct. 1011,

---

1. Plaintiffs acknowledge that LCR 2020–3 "embodies the appropriate procedure that provides due process to employees who are accused of misconduct." Complaint ¶ 13.

1017–18, 25 L.Ed.2d 287 (1970); *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976); *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 321, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985).

For the purposes of this action, the parties do not dispute that Library of Congress employees have a property interest in their employment. Accordingly, due process guarantees apply. *See Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972); *De Sarno v. Department of Commerce*, 761 F.2d 657, 660 (Fed. Cir.1985). The only issue raised herein is whether the procedures outlined in LCR 2020–5 comport with due process.

In arguing that they do not, plaintiffs rely on *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), in which the Supreme Court held that a public employee, prior to his termination, is constitutionally entitled to "some kind of hearing." The Court set forth the process due as follows:

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement....

*Id.* at 546, 105 S.Ct. at 1495. The Court explained that the pre-termination hearing need not be elaborate, and that " '[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.' " *Id.* at 545, 105 S.Ct. at 1495 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)).

### 1. *Pre–Deprivation Process*

■ Plaintiffs' reliance on *Loudermill* to argue that a predeprivation hearing is required under LCR 2020–5 is misplaced, for two reasons. First, *Loudermill* involved a state policy of summarily *terminating* public employees without any opportunity for a hearing. In contrast, this case involves a policy of *suspending* public

employees who exhibit threatening behavior pending a proposed course of action by the agency. For the first five days, while on administrative leave, the suspended employee suffers no loss of salary. Before the employee is placed on enforced leave, the employee receives a phone call, notice of the reasons why the Library feels he poses a threat, and an opportunity to tell his side of the story. Moreover, LCR 2020–5 provides for a prompt post-deprivation hearing with more elaborate procedures, including the opportunity to interview witnesses and to be represented by counsel.

Second, and more important, plaintiffs' reliance on *Loudermill* to argue that a pre-deprivation hearing is required entirely ignores the fact that the procedures embodied in LCR 2020–5 are intended for "emergency situations." LCR 2020–5 § 2A. In non-emergency situations, Library of Congress employees are entitled to a full evidentiary hearing prior to being subject to adverse action. *See* LCR 2020–3. The Supreme Court has recognized the validity of this distinction by pointing out that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." *Loudermill*, 470 U.S. at 544–45, 105 S.Ct. at 1495 (footnote omitted). That is precisely what the Library of Congress has chosen to do through its emergency regulation.

The Court has frequently found that post-deprivation hearings are constitutionally adequate when the government has a strong interest in taking prompt action to avert potential dangers. *See, e.g., Barry v. Barchi*, 443 U.S. 55, 65, 99 S.Ct. 2642, 2649–50, 61 L.Ed.2d 365 (1979) (jockey suspended for 15 days for alleged use of stimulants not entitled to pre-deprivation process); *Dixon v. Love*, 431 U.S. 105, 112–15, 97 S.Ct. 1723, 1727–29, 52 L.Ed.2d 172 (1977) (driver's license may be revoked without pre-deprivation hearing where driver's conduct indicates lack of reasonable care); *Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) (students posing a threat to the school may be

suspended without notice). The lower courts have reached similar results. *See, e.g., D'Acquisto v. Washington,* 640 F.Supp. 594 (N.D. Ill.1986) (upholding immediate suspension of police officers indicted for accepting bribes where there was a preliminary review of the suspension within 7 days and a review by a Police Board within 30 days).

In sum, the law does not require a full evidentiary hearing before the government may temporarily suspend an employee who remains on the payroll. To require elaborate presuspension procedures in this case would entirely ignore the strength of the Library's interest in promptly removing an employee who poses a threat to the Library, its staff, or the public. Any procedural benefits that would inure to employees through a judicially imposed pre-deprivation hearing requirement are greatly outweighed by the Library's interest in taking prompt corrective action when the situation so warrants.

### 2. *Post–Deprivation Process*

Under LCR 2020–5, employees who are suspended for their threatening conduct and subsequently placed on enforced administrative leave are entitled to a post-deprivation proceeding in which they are afforded an opportunity to be heard. This hearing must be held within 10 days of the employee's receiving notice of the Library's decision. LCR 2020–5 § 4D.

Although not an on-the-record proceeding, the law is clear that " 'something less' than a full evidentiary hearing" will satisfy the requirements of due process in most circumstances. *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495 (quoting *Mathews v. Eldridge,* 424 U.S. at 343, 96 S.Ct. at 907). The "essential requirements" of due process are "notice and an opportunity to respond." *Id.,* 470 U.S. at 546, 105 S.Ct. at 1495. LCR 2020–5 clearly provides both. Moreover, the 10–day requirement ensures a prompt review at a "meaningful time," as due process requires. *Loudermill,* 470 U.S. at 547, 105 S.Ct. at 1496; *cf. Fusari v. Steinberg,* 419 U.S. 379, 388–89, 95 S.Ct. 533, 539–40, 42 L.Ed.2d 521 (1975) (delay of

several months in reviewing denial of unemployment benefits raised due process concerns); *D'Acquisto v. Washington,* 640 F.Supp. 594, 614 (N.D. Ill.1986) (hearing held several months after deprivation of employment held to be inadequate).

As the district court in *D'Acquisto* noted, "the government's interest in ridding itself of ineffective or untrustworthy employees is very strong." *Id.* at 613. That court also explained:

> The quality of procedures is judged in the light of the strength of the private and governmental interests at stake. If the individual's interest is significantly weaker than the government's, either from its own lack of weight or because the government's interest in quick action is particularly strong, a hearing which comes only after the deprivation has occurred is constitutionally adequate.

*Id.* at 612. That precise rationale applies to this case. The Library's interest in promptly removing from the premises employees that pose a threat is "particularly strong." And against that interest the Court must weigh the adequacy of the procedures employed. LCR 2020–5 clearly requires both notice and an opportunity for the employee to respond. The Library's policy ensures a prompt post-deprivation hearing at a meaningful time. In view of the strength of the government's interest, the Court finds that the procedures embodied in LCR 2020–5 comport with due process.

### B. *The Regulation as Applied*

Plaintiffs allege that, even assuming LCR 2020–5 is constitutional on its face, defendant is not complying with its terms. Complaint ¶¶ 19–21. Specifically, plaintiffs argue that the Library has placed employees on enforced leave or suspension in the absence of finding a true emergency or without providing a prompt review, thereby violating the terms of LCR 2020–5 and circumventing the more elaborate pre-deprivation procedures of LCR 2020–3. Since its issuance in 1986, LCR 2020–5 has been applied in approximately 25 cases. Plaintiffs maintain that in most of these

cases, the regulation has been applied in an arbitrary and capricious manner.

Initially, the Court questions whether these individual grievances are properly considered in this lawsuit. Although plaintiffs appear to have organizational standing to maintain this action on behalf of their members, *see Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), no individual employee affected by the Library's enforced leave policy has joined the unions as a plaintiff. The Court has received no employee affidavits or other competent evidence to support the unions' allegations that the regulation has been enforced in an arbitrary and capricious manner. Plaintiffs' claims in this respect appear speculative and without a concrete foundation. In other words, the union plaintiffs seem to be asking the Court to render "an opinion advising what the law would be upon a hypothetical set of facts," a task federal courts are without jurisdiction to perform. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937); *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 242–43, 73 S.Ct. 236, 239–40, 97 L.Ed. 291 (1952).

In any event, in view of the lack of any persuasive evidence to the contrary, the Court finds that plaintiffs have failed to show that the Library is applying LCR 2020–5 in an arbitrary and capricious manner. Clearly, whether a given sanction is warranted in any individual case will turn on myriad factual distinctions. One example will suffice. In their briefs and during oral argument, plaintiffs have insisted that one employee, a union steward, was placed on enforced leave for 30 days "solely" because he overturned a cup of coffee.

Plaintiffs argue that enforced leave in this case was clearly unwarranted. In fact, however, it appears that this employee had left arguably threatening letters in the in-boxes of two superiors, and had on two prior occasions overturned a partially filled coffee cup onto his supervisor's chair. On the occasion in question, the employee was found to have intentionally dumped coffee onto his supervisor's desk in the early morning hours, thereby soaking and damaging all the papers thereon. He also appears to have strewn his supervisor's work papers all about. An arbitrator already made such findings and rejected plaintiffs' contention that this employee was suspended under LCR 2020–5 for simply overturning a cup of coffee. Indeed, the arbitrator found plaintiffs' benign characterization to be a "substantial distortion of the evidence" and "without support in the record."[2] The arbitrator concluded: "It is too clear for argument that no union official is entitled to resort to surreptitious and hostile acts such as those in which [this employee] engaged."[3] The Court sees no reason to disturb that finding, nor to second-guess the judgment of the Library of Congress personnel who believed that this employee posed a threat to the Library's property and operations.[4]

Whether a particular situation gives rise to an "emergency" under LCR 2020–5 is a decision best left to the discretion of Library personnel who supervise employees on a daily basis. Similarly, Library of Congress personnel, not this Court, are in the best position to judge whether a particular employee is fit to return to work or whether he poses a continued threat to the Library, its staff, or the public. This Court's review of whether a particular situation

2. Federal Mediation and Conciliation Service Case No. 89–08953 (Dec. 7, 1989), at 5. The arbitrator described the employee's acts as a "pattern of physical acts of violence" and concluded that the adverse action taken by the Library was "clearly based on serious misconduct." *Id.* at 6–7.

3. *Id.* at 13.

4. In another example, plaintiffs point out that while one employee received only five days of administrative leave after he threatened to shoot his supervisor, another employee was placed on enforced leave for nearly one month after he spit in his supervisor's face and threatened him and his father with physical harm. Plaintiffs claim that this discrepancy in result attests to defendant's arbitrary application of LCR 2020–5. The Court declines to make any such ruling in the absence of a competent factual record that would support such a claim.

properly constituted an "emergency" within the meaning of LCR 2020–5, or whether any particular application of LCR 2020–5 was arbitrary and capricious, is best left to a case in which the issues are fully briefed and the affected parties are before the Court. Plaintiffs' claims regarding the alleged arbitrary and capricious application of LCR 2020–5 are simply not supported by the record, and the Court rejects them.

## C. *The First Amendment*

■ The regulation provides that once an employee has been placed on administrative leave, he "may also be requested not to come on Library premises until further notification if such action is warranted by the facts." LCR 2020–5 § 4B. Plaintiffs allege that through this provision, the Library is unlawfully barring access to its public buildings in violation of the first amendment right to peaceful assembly and free association. Complaint ¶¶ 22–23. Plaintiffs compare the actions of the Library of Congress with those occurring in South Africa.

■ Plaintiffs' first amendment challenge is without merit. As defendant points out, although the Library's reading rooms, cafeteria, and other common areas are open to the public, they are not open to the public for purposes of expressive activity. The rooms of the Library of Congress are not a public forum. The law is clear that the federal government may restrict access to public property that is not a public forum. In *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), the Court stated:

> [T]here is little doubt that in some circumstances the government may ban the entry on to public property that is not a "public forum" of all persons except those who have legitimate business on the premises. The government, "no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated."

*Id.* at 178, 103 S.Ct. at 1707 (quoting *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966)). With respect to public property that is not a public forum, the government may, consistent with the first amendment, regulate public access as long as its regulation is reasonable and not an effort to suppress a speaker's point of view. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–56, 74 L.Ed.2d 794 (1983); *see also United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981) ("the First Amendment does not guarantee access to property simply because it is owned or controlled by the government").

On several occasions, though generally in the military context, the Supreme Court has upheld the government's authority to exclude individuals from government property where, as here, the individuals have demonstrated an intention or ability to cause damage or destruction. For example, in *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), the Court held that an individual who was barred from reentering a military base after he vandalized government property was properly barred from reentering the base during an annual open house, regardless of whether the base thereby had been temporarily converted into a "public forum." *Id.* at 684–87, 105 S.Ct. at 2904–06; *see also Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 889–894, 81 S.Ct. 1743, 1745–48, 6 L.Ed.2d 1230 (1961) (Superintendent of Naval Gun Factory had authority to exclude cook from factory after she failed to meet security requirements and lost her job); *cf. Greer v. Spock*, 424 U.S. 828, 840, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976) (military commander may prohibit the distribution of publications that pose a "clear danger" to military loyalty or discipline).

The Library of Congress houses invaluable property. It is one of the finest research facilities in the world. The government should not be required to provide access to disgruntled employees who pose a threat to the Library, its staff, or its patrons. Moreover, if a barred employee needs to enter the Library for some rea-

son—to prepare his appeal, to interview witnesses, or for personal necessity—the Library allows an escorted entry for a reasonable period of time. Scott Depo. (II) 5–7; *see, e.g.,* Exhibit C to Defendant's Motion for Summary Judgment (typical letter informing employee placed on administrative leave that he may enter the Library premises "only with a prior approved, specific appointment"). The Court finds that the access restriction embodied in LCR 2020–5 is reasonable under the circumstances.

The only case on which plaintiffs rely for their position that the entry ban of LCR 2020–5 violates the first amendment is the unpublished preliminary ruling in *Mokhiber v. Boorstin,* No. 86–1160 (D.D.C. Apr. 28, 1986). In that case Judge Harold Greene, in an oral ruling, issued a temporary restraining order enjoining the Library of Congress' enforcement of a flat six-month ban imposed on certain plaintiffs whom the Library deemed disruptive. Judge Greene stated that "first amendment concerns are at least involved" in such a ban. Tr. at 2. But plaintiffs herein do not elaborate on the facts giving rise to that case. And the factual distinctions are relevant.

In *Mokhiber,* the plaintiffs had engaged in expressive activity—such as passing out leaflets, demonstrating in front of the Library, and conducting sit-ins—to protest the Library's cut-back in hours in which it was open to the public. The Library's cutback in hours resulted from budget reductions imposed by the Gramm–Rudman legislation. Plaintiffs believed that Congress had alternatives to cutting the Library's budget, and they protested the early Library closings by promoting the slogan "Books Not Bombs." *Mokhiber v. Boorstin,* No. 86–1160, Complaint ¶ 15. On account of their expressive activities, the plaintiffs were subsequently arrested and banned from the Library for a six-month period. In that context, the district court preliminarily enjoined the Library's actions.

Notably, the district court in *Mokhiber* acknowledged that evidence of a "security threat" might legitimize a denial of access to the Library. Tr. at 3. That, of course, is the situation presented here. Moreover, even if the facts giving rise to *Mokhiber* more closely paralleled those presented here, the district court's preliminary ruling in *Mokhiber* would not undercut the many Supreme Court cases holding that the government may place reasonable restrictions on access to federal property which is not a public forum.[5] The Court concludes that the Library's policy, reasonable under the circumstances, is therefore valid under the first amendment.

## CONCLUSION

The Court concludes that LCR 2020–5 is valid under both the fifth and first amendments. The law does not require an elaborate trial-type hearing before every adverse action taken by a government employer. The regulation was designed for "emergency situations" and provides an adequate postdeprivation hearing to affected employees. It therefore comports with procedural due process. Plaintiffs have failed to establish through any credible evidence that the regulation is being enforced in an arbitrary and capricious manner. Finally, the regulation comports with the first amendment because its restriction on access to a non-public forum is reasonable.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment, the respective oppositions thereto, the arguments of counsel in open Court and the entire record herein, and for the reasons set forth in the accompanying Memorandum, it is by the Court this 1st day of May, 1990,

ORDERED that defendant's motion for summary judgment be, and hereby is, granted; and it is further

---

**5.** The parties in *Mokhiber* ultimately resolved the case through a settlement agreement, hence there was no occasion for the district court to issue a final ruling on the plaintiffs' substantive claims.

ORDERED that plaintiffs' motion for summary judgment be, and hereby is, denied.