958 F.2d 1242
 60 USLW 2607
 Richard R. KREIMER
v.
BUREAU OF POLICE FOR the TOWN OF MORRISTOWN, Jay White,
former chief of police, Morristown; J. Rota, D. McKim, D.
Widdas, D. Bowerbank, R. Gibbons, Kevin Mulholland, police
officers, Morristown, David Manahan, former mayor of
Morristown, Norman Bloch, mayor of Morristown, Terrence J.
Reidy, Morristown business administrator, Edward A. Taratko,
Morris Township business administrator, Barbara Harris,
mayor of Morris Township, Joint Free Public Library of
Morristown and Morris Township: the library Board of
Trustees, Elaine Weil, president of the trustees, Barbara
Rice, library director, B. Riesenfeld, Elaine Kissil, Donna
Cole, Cathy Prince, Ann McDade, Lois Demsky, library
employees, all individually and in their official
capacities, Capt. Walter Gensch.
The JOINT FREE PUBLIC LIBRARY OF MORRISTOWN AND MORRIS
TOWNSHIP Defendant-Third Party Plaintiff,
v.
TRAVELERS INSURANCE COMPANY, and Travelers Indemnity
Company, Third Party Defendants.
The Joint Free Public Library of Morristown and Morris
Township, Appellant.
 No. 91-5501.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 14, 1992.
Decided March 23, 1992.
Rehearing Denied April 21, 1992.
 
 Clifford W. Starrett, Sheilah O'Halloran, James P. Wyse (argued), Wendy L. Wiebalk, Schenck, Price, Smith & King, Morristown, N.J., for appellant.
 Frank Askin (argued), Rutgers School of Law, Constitutional Litigation Clinic, Newark, N.J., Bruce S. Rosen (argued), Andrew E. Anselmi, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for appellee.
 Eric B. Schnurer, Philadelphia, Pa., John A. Powell, American Civil Liberties Union Foundation, New York City for amicus curiae American Civil Liberties Union and American Civil Liberties Union of New Jersey.
 Bruce J. Ennis, David W. Ogden, Theresa Chmara, Jenner & Block, Washington, D.C., for amicus curiae Freedom to Read Foundation.
 Stephen S. Weinstein, Valerie L. Riley, Morristown, N.J., for amicus curiae New Jersey Library Ass'n.
 Joseph L. Yannotti, Asst. Atty. Gen., Benjamin Clarke, Deputy Atty. Gen., Robert J. Del Tufo, Atty. Gen. of N.J., for the Attorney General, amicus curiae.
 David G. Sciarra, Director, Division of Public Interest Advocacy, Isabel McGinty, Asst. Deputy Public Advocate, Wilfredo Caraballo, Public Advocate of New Jersey, for the Public Advocate, amicus curiae.OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 This case compels us to resolve questions concerning the breadth of a public library's authority to promulgate and enforce regulations governing the use of its facilities.
 
 
 2
 The appellee, Richard R. Kreimer, is a homeless man who resides in various outdoor public spaces in Morristown, New Jersey. Kreimer, who was a frequent patron of the Joint Free Public Library of Morristown and Morris Township ("the Library"), was expelled from the Library on at least five occasions for violating its rules governing patron conduct. In response, Kreimer commenced this action in the United States District Court for the District of New Jersey against the Library and others, alleging in his complaint, as ultimately amended, that the rules are facially invalid under the First Amendment, made applicable to the states by the Fourteenth Amendment, as well as under the due process and equal protection clauses of the Fourteenth Amendment, and similar provisions of the New Jersey Constitution. On cross-motions for summary judgment, the district court accepted Kreimer's arguments and issued an interlocutory injunction prohibiting the enforcement of several of the Library's rules. Kreimer v. Bureau of Police for the Town of Morristown, 765 F.Supp. 181 (D.N.J.1991). The Library appeals.
 
 
 3
 The district court's opinion unduly restricts the Library's authority to circumscribe admission to and expulsion from its facility and gives short shrift to its significant interest in achieving the optimum and safest use of its facilities. Indeed, we find that the rules are reasonable "manner" restrictions on the patrons' constitutional right to receive information. We also disagree with the district court's analysis and application of the doctrines of vagueness and overbreadth and further find fault with the court's determination that the Library intended to restrict Kreimer's access to it in violation of the Fourteenth Amendment. In sum, we are satisfied that the rules in issue pass muster under well-established constitutional principles governing facial attacks. Accordingly, we will reverse.
 
 I.
 BACKGROUND
 
 4
 The facts of this case as germane on this facial challenge are essentially undisputed. Pursuant to N.J.Stat.Ann. § 40:54-29.3 (West 1991), Morristown and Morris Township elected to establish and support the Library.[1] Although N.J.Stat.Ann. § 40:54-9 (West 1991) empowers the Board of Trustees of the Library ("the Board")[2] to enact regulations designed to "carry out the purposes of the joint library," the Board did not promulgate any written rules or regulations governing the use of the Library until May 1989. As stated by the Library's former director, Barbara A. Rice, prior to May 1989, the Library staff followed unwritten rules and procedures with the intent:
 
 
 5
 to allow library patrons to use the library's facilities to the maximum extent possible. The library staff ... as trained professional librarians, understood from ... professional training ... experience, and ... common sense that anyone exhibiting behavior which interfered with another patron's reasonable use of library facilities, or who interfered with the work of the library staff, should be asked to stop.
 
 
 6
 App. at 89.
 
 
 7
 Kreimer frequently visited the Library where he claims to have enjoyed reading newspapers, magazines or books, or occasionally sitting in silent contemplation. In the Library's view, however, Kreimer's presence was not so peaceful. The Library contends that he often exhibited offensive and disruptive behavior, including staring at and following patrons and talking loudly to himself and others. It also claims that Kreimer's odor was often so offensive that it prevented the Library patrons from using certain areas of the Library and prohibited Library employees from performing their jobs.[3]
 
 
 8
 Rice, the Director of the Library from June 1, 1986, to December 19, 1990, held monthly staff meetings to discuss how to handle more effectively what she termed "problem behavior" at the Library. This behavior included theft of property, smoking, use of drugs and alcohol, disruptively loud behavior, intimidation of patrons through staring and following them, and exuding of repulsive odors. In 1987, Rice determined that the Library should maintain written records of recurrent problem behavior. Accordingly, it began to keep a logbook detailing the disciplinary problems reported to or observed by the Library staff or patrons. As the Library's brief notes, the logbook reflects that "[b]oth before and after adoption of the written Patron Policy, the Library has been plagued by incidents involving inappropriate conduct on the part of some library patrons." Most of the entries excerpted by the Library in its brief describe Kreimer's alleged behavior: "1/14/89--Kreimer's odor prevents staff member from completing copying task; 3/30/89--Kreimer spent 90 minutes--twice--staring at reference librarians; 6/15/89--[Library Director] called police after Kreimer was belligerent and hostile towards her; 7/21/89--Patron ... followed by Kreimer after leaving Library...."
 
 
 9
 In May 1989, the Board determined that it would enact written rules expressly prohibiting certain behavior in the Library, and authorizing the Library Director to expel any patron who violated them. The stated purpose of these rules, entitled "Patron Conduct," was to "allow all patrons of the joint free public library of Morristown and Morris Township to use its facilities to the maximum extent possible during its regularly scheduled hours." The rules included the following provisions:
 
 
 10
 1. Patrons shall be engaged in normal activities associated with the use of a public library while in the building. Patrons not engaged in reading, studying, or using library materials may be asked to leave the building. Loitering will not be tolerated.
 
 
 11
 ....
 
 
 12
 5. Patrons shall respect the rights of other patrons and shall not annoy others through noisy or boisterous activities, by unnecessary staring, by following another person through the building, by playing walkmans or other audio equipment so that others can hear it, by singing or talking to oneself or by other behavior which may reasonably result in the disturbance of other persons.
 
 
 13
 ....
 
 
 14
 9. Patron dress and personal hygiene shall conform to the standard of the community for public places. This shall include the repair or cleanliness of garments.
 
 
 15
 Any patron not abiding by these or other rules and regulations of the Library, may be asked to leave the Library premises. Library employees shall contact the Morristown Police if deemed advisable.
 
 
 16
 Any patron who violates the Library rules and regulations may be denied the privilege of access to the Library by the Library Board of Trustees, on recommendation of the Library Director.
 
 
 17
 App. at 130.
 
 
 18
 While this set of rules was in effect, the Library expelled Kreimer on at least two occasions for violations of rules 1 and 9.
 
 
 19
 In response, Kreimer consulted with the American Civil Liberties Union of New Jersey which wrote to the Library on July 5, 1989, asserting that several provisions of this set of rules were unconstitutional. First, the ACLU-NJ stated that "the policy against loitering is vague and therefore a violation of the Due Process clause of the Fourteenth Amendment as well as a violation of our state constitution." The ACLU-NJ also indicated its view that "the library policy is ... constitutionally infirm in that it encompasses behavior which 'annoys' other patrons." In addition, it found "[e]qually offensive ... section 9 of the policy which mandates that personal dress and hygiene conform to the 'community standards'." Finally, the ACLU-NJ asserted that "[a]llowing library officials, in their own discretion, to ban individuals in the absence of specific guidelines and standards, makes the policy defective for its vagueness."
 
 
 20
 The Library responded to the ACLU-NJ's concerns in a letter dated July 14, 1989, noting that "access to the Library is a privilege or license granted by the Library to all on condition that the reasonable rules and regulations of the Library are complied with.... In our opinion, the Executive Director of the Library or her authorized representative has the power and the responsibility to revoke the privilege of a patron to use the Library facilities when the rules and regulations are violated, including the power to require the patron to leave the Library premises." However, on July 25, 1989, in an attempt to assuage the ACLU-NJ's concerns, the Board modified provisions 1, 5, and 9, as well as the two unnumbered paragraphs following rule 9, so that they, along with rule 6, read as follows:
 
 
 21
 1. Patrons shall be engaged in activities associated with the use of a public library while in the building. Patrons not engaged in reading, studying, or using library materials shall be required to leave the building.
 
 
 22
 ....
 
 
 23
 5. Patrons shall respect the rights of other patrons and shall not harass or annoy others through noisy or boisterous activities, by staring at another person with the intent to annoy that person, by following another person about the building with the intent to annoy that person, by playing audio equipment so that others can hear it, by singing or talking to others or in monologues, or by behaving in a manner which reasonably can be expected to disturb other persons.
 
 
 24
 6. Patrons shall not interfere with the use of the Library by other patrons, or interfere with Library employees' performance of their duties.
 
 
 25
 ....
 
 
 26
 9. Patrons shall not be permitted to enter the building without a shirt or other covering of their upper bodies or without shoes or other footwear. Patrons whose bodily hygiene is offensive so as to constitute a nuisance to other persons shall be required to leave the building.
 
 
 27
 Any patron not abiding by these or other rules and regulations of the library shall be asked to leave the library premises. Library employees shall contact the Morristown Police if deemed advisable.
 
 
 28
 Any patron who violates the Library rules and regulations shall be denied the privilege of access to the Library by the Library Board of Trustees, on recommendation of the Library Director. Any patron whose privileges have been denied, may have the decision reviewed by the Board of Trustees.
 
 
 29
 Supp.App. at 21.
 
 
 30
 Although the ACLU-NJ to an extent approved of the Library's extensive modifications of its previous rules, it maintained that the rules still accorded the Library staff with excessive discretion to determine who may use the Library, and expressed fear that this discretion would be exercised "in a discriminatory manner against homeless people." It reiterated that "the provision concerning bodily hygiene will result in discriminatory treatment of the homeless by virtue of their status." The Library, however, elected not to modify the rules further, and expelled Kreimer from its premises when he did not comply.
 
 
 31
 On January 2, 1990, Kreimer filed a pro se complaint in the district court against the Morristown Bureau of Police, the Library, the Board, Rice, three Library employees and four police officers, seeking punitive and compensatory damages for "pain and suffering, emotional distress, humiliation, negligence, violation of ... civil rights to enter a public building, first amendment rights violations, harassment, defamation of character, and discrimination because of my homeless status" stemming from his ejection from the Library. Kreimer filed an amended complaint on February 16, 1990, which enlarged the named defendants to include the Morristown Chief of Police, the President of the Library and the Morristown Business Administrator. On May 7, 1990, Kreimer filed a second amended complaint naming as additional defendants the former and then-current mayors of Morristown, the then-current mayor and business administrator of Morris Township, an additional police officer, two additional Library employees and the President of the Board.
 
 
 32
 Subsequently, the district court appointed counsel for Kreimer who, on September 14, 1990, filed another amended complaint which we simply call the complaint. Count one of the complaint alleged that the rules "are vague and overbroad, both on their face and as applied by library employees, in violation of the plaintiffs [sic] rights under the First Amendment and plaintiff's right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution." This count additionally alleged that the rules, as written and applied, violated Kreimer's right to:
 
 
 33
 equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution, because the subjective (and vague) standards in the policy, even if objectively definable, cannot be met by the plaintiff or others who cannot maintain the same degree of bodily hygiene because of their homeless status or because of an involuntary physical condition. The policies are not applied equally to the plaintiff and other homeless individuals as they are to other library patrons.
 
 Supp.App. at 14.[4]
 
 34
 Count two of the complaint alleged violations of the New Jersey Constitution, as well as of N.J.Stat.Ann. § 2C:1-5(d) (West 1982), which provides that "the local governmental units of this State may neither enact nor enforce any ordinance or other local law or regulation conflicting with, or preempted by, any provision of this code or with any policy of this State expressed by this code." It further asserted that the defendants violated New Jersey common law construing and enforcing the statute. Accordingly, Kreimer sought a preliminary and permanent injunction against the enforcement of rules 1, 5, and 9,[5] and the two unnumbered paragraphs, as well as compensatory and punitive damages and attorneys fees.[6]
 
 
 35
 On October 30, 1990, the defendants answered the complaint and requested in a counterclaim that the court issue an order "restraining and enjoining [Kreimer] from entering ... [the Library and] ... restraining and enjoining ... Kreimer from harassing the patrons and employees of the Library in or about the Library premises including the sidewalks and streets abutting the Library." The defendants additionally sought attorneys fees and costs under 42 U.S.C. § 1988.[7]
 
 
 36
 The defendants then moved either to dismiss the complaint in its entirety or for a summary judgment upholding the facial validity of the rules, and Kreimer filed a cross-motion to dismiss the counterclaim and for a summary judgment that the rules are facially invalid under the First and Fourteenth Amendments to the United States Constitution, as well as under the New Jersey Constitution. On May 16, 1991, the court heard oral argument on the motions for summary judgment, and on May 22, 1991, it issued an order denying the defendants' motion for summary judgment and granting summary judgment for Kreimer. Accordingly, the court ordered that paragraphs 1, 5 and 9, as well as the two unnumbered paragraphs, were "null and void on their face and unenforceable," and enjoined the Library from enforcing those provisions.[8] The Library appeals and we have jurisdiction under 28 U.S.C. § 1292(a)(1).
 
 II.
 ANALYSIS
 A. Standard of Review
 
 37
 Our review of the district court's order granting summary judgment in Kreimer's favor is plenary. Maguire v. Hughes Aircraft Corp., 912 F.2d 67, 69 (3d Cir.1990); IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 122 (3d Cir.1986).[9] In determining whether summary judgment was correctly granted, we must:
 
 
 38
 apply the same test the district court should have utilized initially. Inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true, and when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.
 
 
 39
 Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).
 
 
 40
 Summary judgment may only be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover, as we reiterated in Losch v. Borough of Parkesburg, 736 F.2d 903 (3d Cir.1984), "[w]hile summary judgment may be based upon affidavits, conflicts of credibility should not be resolved on a hearing on the motion for summary judgment unless the opponent's evidence is 'too incredible to be believed by reasonable minds.' " Id. at 909 (quoting 6 J. Moore, Moore's Federal Practice p 56.15(4) at 56-512.3-56-530).
 
 
 41
 In most cases, an appellate court reversing a grant of summary judgment will not direct the district court to enter a summary judgment order in favor of the appellant, because a genuine issue of fact will remain. First National Bank v. Lincoln National Life Insurance Co., 824 F.2d 277, 281 (3d Cir.1987). However, when the appeal concerns only issues of law, as in this case, we are free to enter an order directing summary judgment in favor of the appellant. Id. at 281. See Nazay v. Miller, 949 F.2d 1323, 1328 (3d Cir.1991); Beck v. Reliance Steel Products Co., 860 F.2d 576, 581 (3d Cir.1988).
 
 
 42
 B. First Amendment Right to Receive Information
 
 
 43
 The first issue to be addressed in any challenge to the constitutional validity of a rule under the First Amendment is whether a First Amendment right exists, for "if it [does] not, we need go no further." Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985). Kreimer bases his First Amendment claim in the "right to receive information and ideas," and identifies the "vital role played by public libraries" in promoting the fullest exercise of that right. The Library denies that a First Amendment analysis is even applicable and contends instead that the right to receive information "has been found to exist only in cases involving content-based censorship." Our review of the relevant Supreme Court cases, as set forth below, leads us to conclude that a right to receive information founded under the First Amendment is implicated in this case.
 
 
 44
 The First Amendment declares in broad terms that "Congress shall make no law ... abridging the freedom of speech...." As history has confirmed, the "speech" component to this constitutional right is far-reaching and includes various methods of communication. However, it was not until Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), that the Supreme Court decided whether it includes the freedom to receive speech as well as the freedom to speak.
 
 
 45
 In Martin, the appellant, a Jehovah's Witness, distributed a leaflet to people's homes advertising a meeting of her religious group. Although she "proceeded in a conventional and orderly fashion," id. at 142, 63 S.Ct. at 863, she was convicted and fined for violating the following ordinance:
 
 
 46
 It is unlawful for any person distributing handbills, circulars or other advertisements to ring the door bell, sound the door knocker, or otherwise summon the inmate or inmates of any residence to the door for the purpose of receiving such handbills, circulars or other advertisements they or any person with them may be distributing.
 
 
 47
 Id.
 
 
 48
 On appeal she urged that the ordinance as applied to her violated the First and Fourteenth Amendments guaranteeing the freedom of speech, press and religion.
 
 
 49
 The Supreme Court agreed for three reasons. First, the Court observed that the framers "knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature ... and necessarily protects the right to receive it." Id. at 143, 63 S.Ct. at 863 (emphasis supplied) (footnote omitted). Second, the Court recognized that there were three potentially conflicting interests in the case: the appellant's interests in distributing information, the household dweller's interest in choosing whether to receive that information, and the interests of the community in protecting all its citizens, including those who prefer not to receive this information. In the Court's view, the ordinance improperly "substitutes the judgment of the community for the judgment of the individual householder," id. at 143-44, 63 S.Ct. at 863, without carefully considering the interests at stake.
 
 
 50
 Finally, the Court underscored that the distribution of pamphlets constituted an important means to disseminate ideas "in accordance with the best tradition of free discussion." Id. at 145, 63 S.Ct. at 864. Because the freedom to distribute and receive information was "so clearly vital to the preservation of a free society" the Court announced that it "must be fully preserved." Id. at 146-47, 63 S.Ct. at 865. Thus, the Court declared the ordinance unconstitutional.
 
 
 51
 Later, in Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), the Supreme Court considered the constitutionality of a federal law requiring that certain mail be detained until the addressee is notified and requests delivery. The statute in question provided in pertinent part:
 
 
 52
 Mail matter, except sealed letters, which originates or which is printed or otherwise prepared in a foreign country and which is determined by the Secretary of the Treasury pursuant to rules and regulations to be promulgated by him to be 'communist political propaganda', shall be detained by the Postmaster General upon its arrival for delivery in the United States ... and the addressee shall be notified that such matter has been received and will be delivered only upon the addressee's request....
 
 
 53
 Id. at 302, 85 S.Ct. at 1494.
 
 
 54
 The Supreme Court determined that the statute was unconstitutional "because it requires an official act (viz., returning the reply card) as a limitation on the unfettered exercise of the addressee['s] First Amendment rights." Id. at 305, 85 S.Ct. at 1495. In the Court's view, the statutory requirement that the addressee return a reply card constituted an undue burden on the flow of ideas to the public, and stifled the " 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment." Id. at 307, 85 S.Ct. at 1496-97 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)).
 
 
 55
 Justice Brennan, concurring, made explicit what the majority assumed, observing that the question posed would be more troubling "if the addressees predicated their claim for relief upon the First Amendment rights of the senders." Id., 381 U.S. at 307, 85 S.Ct. at 1497. However, the addressees grounded their argument in a personal right to receive information, and "the decision[ ] today uphold[s] this contention...." Id. at 308, 85 S.Ct. at 1497. Justice Brennan's oft-quoted remark in Lamont now constitutes the hallmark of the right to receive information: "[t]he dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them ... [for] [i]t would be a barren marketplace of ideas that had only sellers and no buyers." Id.
 
 
 56
 In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Court, in a plurality opinion, again placed its imprimatur on the constitutional right to receive information. There, the appellants Griswold, the Executive Director of the Planned Parenthood League of Connecticut ("the League"), and Buxton, the Medical Director of the League, gave information and instruction to married persons concerning contraception. Connecticut prosecuted them for violations of statutes which provided that "[a]ny person who uses any drug, medicinal article or instrument for the purpose of preventing conception shall be fined ... or imprisoned ... or be both fined and imprisoned" and "[a]ny person who assists, abets, counsels, causes, hires or commands another to commit any offense may be prosecuted and punished as if he were the principal offender." Id. at 480, 85 S.Ct. at 1679.
 
 
 57
 The Court struck down each provision as unconstitutional on a variety of grounds, including the First Amendment. The Court reasoned that:
 
 
 58
 [T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read ... and freedom of inquiry, freedom of thought, and freedom to teach.... Without those peripheral rights the specific rights would be less secure.
 
 
 59
 Id. at 482-83, 85 S.Ct. at 1680-81.
 
 
 60
 Hence, the First Amendment, like other constitutional guarantees, encompassed the "penumbral" right to receive information to ensure its fullest exercise. Id. at 483, 85 S.Ct. at 1681.
 
 
 61
 In Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), a majority of the Supreme Court agreed that the First Amendment encompasses the right to receive information and ideas. There, the Court reversed the conviction of a defendant prosecuted under a state statute proscribing the private possession of obscene matter. Although the Court agreed that the government has a valid interest in "dealing with the problem of obscenity," id. at 563, 89 S.Ct. at 1247, this interest did not foreclose an analysis of whether all possession of obscene material, including private possession, could be forbidden.
 
 
 62
 At the outset of its analysis, the Court observed that "[i]t is now well established that the Constitution protects the right to receive information and ideas," id. at 564, 89 S.Ct. at 1247, citing Martin, Lamont and Griswold as support for that proposition. The Court explained that the "right to receive information and ideas, regardless of their social worth ... is fundamental to our free society." Id. The Court determined that, to protect the right to receive information and ideas, as well as the right to "satisfy [one's] intellectual and emotional needs in the privacy of [one's] home," id. at 565, 89 S.Ct. at 1248, the state was precluded from making private possession of obscene material a crime.
 
 
 63
 Next, in Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Court extended the right to receive information beyond the censorship context. In Red Lion the Court upheld Federal Communications Commission requirements that a radio station furnish a person who was the subject of certain attacks with a tape, transcript or a summary of the broadcast and provide that person with free broadcast time for response. A clear majority of the Court found that "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." Id. at 390, 89 S.Ct. at 1806. The Court further declared that "[i]t is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC." Id. at 390, 89 S.Ct. at 1807 (emphasis supplied). The broadcasters did not possess an unfettered right to make broadcast time available to those who could pay most, for the benefit of producing an "informed public capable of conducting its own affairs" outweighed any burden imposed on the broadcasters by the regulations. Id. at 392, 89 S.Ct. at 1807.
 
 
 64
 Although the Supreme Court subsequently recognized the right to receive information in several other decisions, see, e.g., First National Bank of Boston v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978) ("First Amendment ... afford[s] the public access to discussion, debate, and the dissemination of information and ideas"); Kleindienst v. Mandel, 408 U.S. 753, 762, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972) (First Amendment encompasses "right to receive information and ideas"), this issue generated vigorous debate in Board of Education v. Pico, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), which includes seven separate opinions. There, the Board of Education of Island Trees Union Free School District No. 26 ordered that certain books which it characterized as "anti-American, Anti-Christian, and anti-Sem[i]tic, and just plain filthy," id. at 857, 102 S.Ct. at 2803, be removed from high school and junior high school libraries within the school district. Students in that district brought suit for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that the school board's actions had unlawfully infringed their First Amendment right to receive information. The district court granted summary judgment in favor of the board, but the Court of Appeals for the Second Circuit reversed and remanded, ordering a trial on the merits of the students' allegations. A plurality of the Supreme Court affirmed the court of appeals' judgment, concluding that "the First Amendment impose[s] ... limitations upon the discretion of [the School Board] to remove library books from the [schools and] ... the affidavits and other evidentiary materials before the District Court, construed most favorably to [the students], raise a genuine issue of fact whether [the School Board] might have exceeded those limitations." Id. at 863, 102 S.Ct. at 2806.
 
 
 65
 The plurality recognized that "local school boards have broad discretion in the management of school affairs," id., but held that such discretion is not absolute and "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." Id. at 864, 102 S.Ct. at 2806-07. See, e.g., West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (school board cannot compel a student to salute the flag in a public school); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (suspension of students in a public school for wearing black armbands to protest the Vietnam War violated students' First Amendment rights). Although the Pico plurality agreed that courts "should not 'intervene in the resolution of conflicts which arise in the daily operation of school systems' unless 'basic constitutional values' are 'directly and sharply implicate[d],' " id., 457 U.S. at 866, 102 S.Ct. at 2807-08 (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968)), it found that the "right to receive information" directly implicated the students' free speech rights.
 
 
 66
 The plurality observed that the First Amendment protects not only the right to self-expression, but also guarantees " 'public access to discussion, debate, and the dissemination of information and ideas.' " Id., 457 U.S. at 866, 102 S.Ct. at 2808 (quoting First National Bank of Boston v. Bellotti, 435 U.S. at 783, 98 S.Ct. at 1419). Moreover, it indicated that the right to receive information:
 
 
 67
 is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, in two senses. First, the right to receive ideas follows ineluctably from the sender's First Amendment right to send them.... More importantly, the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom.
 
 
 68
 Id., 457 U.S. at 867, 102 S.Ct. at 2808 (emphasis in original).
 
 
 69
 In the plurality's view, this constitutional guarantee carried no less force in the public school library context because "such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." Id. at 868, 102 S.Ct. at 2808-09. Indeed, the "special characteristics of the school library make that environment especially appropriate for the recognition of the First Amendment rights of students," for the library, unlike the school classroom, is a place for voluntary inquiry and study. Id. at 868, 102 S.Ct. at 2809 (emphasis in original). The plurality then identified certain limitations on the school board's discretion to remove books, and affirmed the court of appeals' remand to assess whether those limitations had been exceeded.
 
 
 70
 The four spirited dissents prompted by Pico each focused on the school board's duty to " 'inculcat[e] fundamental values necessary to the maintenance of a democratic political system,' " id. at 889, 102 S.Ct. at 2819 (quoting Ambach v. Norwick, 441 U.S. 68, 74, 99 S.Ct. 1589, 1595, 60 L.Ed.2d 49 (1979)), and the broad discretion needed properly to carry out that responsibility. The dissenters believed that the plurality's decision would trigger an improper arrogation of the school board's power to the courts. For example, Chief Justice Burger declared that, "[u]ltimately the federal courts will be the judge of whether the motivation for book removal was 'valid' or 'reasonable.' ... Discretion must be used, and the appropriate body to exercise that discretion is the local elected school board, not judges." Id., 457 U.S. at 890-91, 102 S.Ct. at 2820. Justice Powell similarly noted that "[t]he plurality opinion today rejects a basic concept of public school education in our country: that the States and locally elected school boards should have the responsibility for determining the educational policy of public schools." Id. at 893, 102 S.Ct. at 2821-22. Justice Rehnquist likewise stated, "when [the government] acts as an educator, at least at the elementary and secondary school level, the government is engaged in inculcating social values and knowledge in relatively impressionable young people.... [A]ctions by the government as educator do not raise the same First Amendment concerns as actions by the government as sovereign." Id. at 909-10, 102 S.Ct. at 2829-30. Similarly, Justice O'Connor agreed that "the plurality's analysis overlooks the fact that in this case the government is acting in its special role as educator." Id. at 921, 102 S.Ct. at 2835.
 
 
 71
 The dissenters in Pico made no contention that the First Amendment did not encompass the right to receive information and ideas, but merely argued that the students could not freely exercise this right in the public school setting in light of the countervailing duties of the School Board. Justice Rehnquist's opinion highlighted the source of contention when he declared: "The libraries of [elementary and secondary] schools serve as supplements to this inculcative role. Unlike universities or public libraries, elementary and secondary schools are not designed for freewheeling inquiry; they are tailored, as the public school curriculum is tailored, to the teaching of basic skills and ideas." Id. at 915, 102 S.Ct. at 2832 (emphasis supplied).
 
 
 72
 Our review of the Supreme Court's decisions confirms that the First Amendment does not merely prohibit the government from enacting laws that censor information, but additionally encompasses the positive right of public access to information and ideas. Pico signifies that, consistent with other First Amendment principles, the right to receive information is not unfettered and may give way to significant countervailing interests. At the threshold, however, this right, first recognized in Martin and refined in later First Amendment jurisprudence, includes the right to some level of access to a public library, the quintessential locus of the receipt of information.
 
 C. The Facial Validity of the Rules
 
 73
 The recognition of a constitutional right protecting public access to information and ideas is simply the threshold of our analysis. Our next step is to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Cornelius, 473 U.S. at 797, 105 S.Ct. at 3446.
 
 1. The Perry Approach
 
 74
 In Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Court adopted the "forum" analysis to determine whether a given rule or regulation violates the First Amendment. There, a school district and the duly elected exclusive bargaining representative for the school district's teachers entered into a collective bargaining agreement which granted the representative sole access to teacher mailboxes and the inter-school mail system to the exclusion of a rival union. The rival union contended that such preferential access to the mail system was unconstitutional under the First and Fourteenth Amendments.
 
 
 75
 In evaluating the rival union's First Amendment argument, the Court noted that "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending upon the character of the property at issue," id. at 44, 103 S.Ct. at 954, for the First Amendment requires neither equal nor unlimited access to public places. Thus, the Court identified three categories of government fora to inform an evaluation of the First Amendment's mandates.
 
 
 76
 The first class of government fora encompasses "places which by long tradition or by government flat have been devoted to assembly and debate...." Id. at 45, 103 S.Ct. at 954. This category includes streets and parks and public sidewalks, and other public spaces which " 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " Id., 103 S.Ct. at 954-55 (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)). The government's right to limit First Amendment activity in these "quintessential" public fora is "sharply circumscribed." Id., 103 S.Ct. at 954. The Court held that content-based government regulations in this context are permissible only where "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." Id., 103 S.Ct. at 955. Further, content-neutral time, place or manner restrictions are permissible if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id.
 
 
 77
 The second class of government fora consists of "public property which the state has opened for use by the public as a place for expressive activity." Id. Although the government is not required to open or indefinitely retain the open nature of these fora, once it does so the government is bound by the same limitations as exist in the traditional public forum context. In the Court's words, "[r]easonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." Id., 460 U.S. at 46, 103 S.Ct. at 955.
 
 
 78
 The third category of government property includes "nonpublic" fora which are not "by tradition or designation [fora] for public communication...." Id. at 46, 103 S.Ct. at 955. The Court reaffirmed that " '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " Id. In this setting, the government may enact and enforce "time, place, and manner regulations, [to] ... reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression because public officials oppose the speaker's view." Id.
 
 
 79
 Applying its principles to the facts at issue in Perry, the Court concluded that the school's internal mailing system was neither a traditional public forum nor a designated public forum. It rejected the rival union's contention that the mailing system fell within the designated public forum category and observed that, "[i]f by policy or by practice the Perry School District ha[d] opened its mail system for indiscriminate use by the general public, then [the rival union] could justifiably argue a public forum has been created." Id. at 47, 103 S.Ct. at 956. However, the record contained:
 
 
 80
 no indication ... that the school mailboxes and inter-school delivery system are open for use by the general public. Permission to use the system to communicate with teachers must be secured from the individual building principal. There is no court finding or evidence in the record which demonstrates that this permission has been granted as a matter of course to all who seek to distribute material.... This type of selective access does not transform government property into a public forum.
 
 
 81
 Id.
 
 
 82
 Moreover, the Court held that, even if the government had created some kind of designated public forum, "the constitutional right of access would in any event extend only to other entities of similar character." Id. at 48, 103 S.Ct. at 956 (emphasis supplied). Because the union was not similar in nature to those entities that had traditionally been permitted to use the mail system, this caveat did not apply.
 
 
 83
 It is clear to us that a public library, albeit the "quintessential" locus for the exercise of the right to receive information and ideas, is sufficiently dissimilar to a public park, sidewalk or street that it cannot reasonably be deemed to constitute a traditional public forum. Obviously, a library patron cannot be permitted to engage in most traditional First Amendment activities in the library, such as giving speeches or engaging in any other conduct that would disrupt the quiet and peaceful library environment. We thus reject the district court's conclusion that the Library constitutes a " 'quintessential,' 'traditional' public forum whose accessibility affects the bedrock of our democratic system." 765 F.Supp. at 181 (quoting Perry, 460 U.S. at 45, 103 S.Ct. at 955). Accordingly, we must turn for guidance to the Court's decisions that focus on when government property constitutes a "designated public forum."
 
 2. Designated Public Fora
 
 84
 a. Traditional test:
 
 
 85
 In Southeastern Promotions, Limited v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975),[10] the Court concluded that a municipal theater constituted a designated public forum. There, a promoter of theatrical productions applied to the directors of the Chattanooga Memorial Auditorium to present the musical "Hair" at the city-leased auditorium. The directors rejected the promoter's applications on the ground that the musical involved nudity and obscenity, and was therefore not "in the best interest of the community." Id. at 548, 95 S.Ct. at 1241. The promoter brought suit in the United States District Court for the Eastern District of Tennessee, which determined that the nudity and obscenity in the musical constituted criminal acts, not speech or symbolic speech, and were thus not entitled to First Amendment protection. On appeal, the United States Court of Appeals for the Sixth Circuit affirmed. The Supreme Court granted certiorari and reversed, holding that the "[directors'] rejection of [the promotor's] application to use this public forum accomplished a prior restraint under a system lacking in constitutionally required minimal procedural safeguards." Id. at 552, 95 S.Ct. at 1243.
 
 
 86
 In reaching its conclusion, the Court underscored the "public" nature of the theaters. It held that the theaters were "designed for and dedicated to expressive activities." Id. at 555, 95 S.Ct. at 1245. Next, the Court observed that the promoter "was not seeking to use a facility primarily serving a competing use." Id. The Court additionally noted that "[n]o rights of individuals in surrounding areas were violated by noise or any other aspect of the production." Id. at 555-56, 95 S.Ct. at 1245. On this basis, the Court determined that the government had opened the theater to the public, and its conduct generated a constitutional right of fair access to it.
 
 
 87
 In Madison Joint School District v. Wisconsin Employment Relations Com., 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), the Court held that a school board meeting constituted a designated public forum. There, a teachers' union commenced an action alleging that the school board had committed an improper labor practice by permitting a teacher to speak at a public school board meeting in opposition to an agency shop proposition. The state employment relations commission, which was affirmed by the state Supreme Court, ordered the board to cease permitting employees, other than union representatives, to speak at meetings on matters subject to collective bargaining. In holding that the teacher could not constitutionally be prohibited from speaking at the meeting, the Court ultimately concluded that the order was an unlawful prior restraint based in part on the content of the speech but, as significant here, the Court emphasized that "the school board meeting ... was open to the public." Id. at 174-75, 97 S.Ct. at 426 (footnote omitted). In the Court's view, "[w]here the State has opened a forum for direct citizen involvement, it is difficult to find justification for excluding teachers who make up the overwhelming proportion of school employees and who are most vitally concerned with the proceedings." Id. at 175, 97 S.Ct. at 426 (footnote omitted).
 
 
 88
 In Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court found that public university meeting places constitute designated public fora. In that case, a registered student religious group at the University of Missouri at Kansas City, a state university, sought to use university facilities to conduct its meetings, but the university informed the group that it could not due to a university regulation prohibiting the use of university buildings or grounds "for purposes of religious worship or religious teaching." Id. at 265 n. 3, 102 S.Ct. at 272 n. 3. The student group challenged the university's actions as violative of its First Amendment rights and the Supreme Court agreed, determining that:
 
 
 89
 Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups. Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place.
 
 
 90
 Id. at 267-68, 102 S.Ct. at 273 (footnote omitted). See also Police Dept. of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).
 
 
 91
 The Court concluded that the university could not prohibit a religious student group from using the facilities when it permitted non-religious groups to do so. However, the Court recognized that the university's actions did not transform it into a full-fledged traditional public forum, noting "[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission...." Id., 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5. Accord, Tinker v. Des Moines Independent Community School District, 393 U.S. at 506, 89 S.Ct. at 736 (First Amendment rights must be construed in "in light of the special characteristics of the school environment.")
 
 
 92
 b. Modern developments:
 
 
 93
 The Supreme Court's recent opinions on the characteristics of designated public fora, Cornelius, 473 U.S. 788, 105 S.Ct. 3439, and United States v. Kokinda, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), seem to have slightly modified the Court's previous definition, but in our view should not be read as signaling a departure from the Court's established principles. In Cornelius, "Legal Defense Funds" brought suit in federal court challenging the constitutionality of an executive order which barred them from participating in the Combined Federal Campaign ("CFC"), a charity drive aimed at federal employees and military personnel. Although the Court reaffirmed that charitable solicitation constituted speech and was protected by the First Amendment, it deemed the executive order to be proper, relying on the "nonpublic" nature of the CFC[11] to support its analysis. In the Cornelius Court's words:
 
 
 94
 The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.... Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum.... The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.
 
 
 95
 Id., 473 U.S. at 802, 105 S.Ct. at 3449.
 
 
 96
 There, the Court found that neither the practice nor the policy of the CFC was consistent with an intent to designate the CFC as a public forum, nor did the history of the CFC indicate that the government "was motivated by an affirmative desire to provide an open forum for charitable solicitation in the federal workplace when it began the Campaign." Id. at 804-05, 105 S.Ct. at 3450.[12] Finally, the nature of the CFC bolstered the Court's conclusion that it was not a public forum, for "the Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees." Id. at 805-06, 105 S.Ct. at 3451. Because the CFC was not a public forum, the Court merely reviewed the order to ensure that it was "reasonable in light of the purpose served by the forum and [was] viewpoint neutral." Id. at 806, 105 S.Ct. at 3451.
 
 
 97
 In Kokinda, the defendants were convicted of soliciting contributions on a sidewalk entirely on Postal Service property in front of a post office in violation of a Postal Service regulation. The defendants contended that the sidewalk was a public forum, and that the regulations were not narrowly tailored to further a significant government interest. A sharply divided Court disagreed. A four-justice plurality concluded that the sidewalk in front of the Post Office constituted neither a traditional nor a designated public forum. In rejecting the defendants' contention that the sidewalk was a designated public forum, the plurality observed, "[t]he Postal Service has not expressly dedicated its sidewalks to any expressive activity. Indeed, postal property is expressly dedicated to only one means of communication: the posting of public notices on designated bulletin boards.... No postal service regulation opens postal sidewalks to any First Amendment activity." 110 S.Ct. at 3121. In addition, the postal regulation specifically prohibiting disruption evinced the government's desire to retain control over the forum. Finally, heeding Cornelius' directive that government intent is of primary significance in the analysis, the Court repeated that " '[t]he government does not create a public forum by ... permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse.' " Id. at 3121 (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449 (emphasis in original)).[13]
 
 3. Limited Public Fora
 
 98
 In our view, an application of the Supreme Court's declarations concerning this issue, as well as an examination of the factual similarities and dissimilarities among the cases discussed above and the present one, confirm that the Library constitutes a limited public forum, a type of designated public fora.[14]
 
 
 99
 a. Government intent:
 
 
 100
 Our first step in this analysis which leads us to reach this conclusion is to determine whether the government, here Morristown and Morris Township, intended to open a non-traditional forum[15] for expressive activity.[16] It is of great significance that Morristown and Morris Township were not obliged to open a public library; rather, they did so by choice. Moreover, the New Jersey statute governing the establishment of public libraries provides that "[n]o such library shall be established in any municipality unless assented to by a majority of the legal voters of the municipality, at an election, general or special, at which the question of the adoption of this article shall be submitted to vote by direction of the governing body." N.J.Stat.Ann. § 40:54-2. Further, the stated purpose of the rules at issue here is to "allow all patrons of the Joint Free Public Library of Morristown and Morris Township to use its facilities to the maximum extent possible during its regularly scheduled hours." These facts establish a governmental intent to open the Library to the public for specific purposes.[17] In this case, the government intentionally opened the Library to the public for expressive activity, namely "the communication of the written word."b. Extent of use:
 
 
 101
 Our next step is to determine the extent of use granted, for if the government has retained the discretion to choose whom it will permit to enter the Library, this will undercut an assertion that the government intentionally opened the Library to the public for the exercise of specific First Amendment activities. We note in this regard that a designated public forum need not be open to the public at large, but may be opened to a specific class of people or for the discussion of certain subject matter. See, e.g., Widmar v. Vincent, 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5 (although a university campus is a designated public forum, campus need not "make all of its facilities equally available to students and nonstudents alike, or ... grant free access to all of its grounds or buildings"). See also Perry Education Association v. Perry Local Educators' Association, 460 U.S. at 45 n. 7, 103 S.Ct. at 955 n. 7 ("A public forum may be created for a limited purpose such as use by certain groups ... or for the discussion of certain subjects");[18] Brody v. Spang, 957 F.2d 1108, 1117-18, (3d Cir.1992) ("When examining the extent of use granted, we must be mindful that a designated public forum 'may be so designated for only limited uses or for a limited class of speakers.' ") (Quoting Student Coalition for Peace v. Lower Merion School Dist. Bd. of Directors, 776 F.2d 431, 436 (3d Cir.1985)).
 
 
 102
 The limited information in the record indicates that the Library does not retain unfettered discretion governing admission. Indeed, N.J.Stat.Ann. § 40:54-29.3, provides that the Library is "for the use and benefit of the residents of [Morristown and Morris Township]." Hence, unlike Cornelius,[19] the facts do not suggest that the government must affirmatively grant permission to each resident who wishes to enter on each occasion.[20] Rather, the record indicates that the Library exercises its authority to exclude a patron only after his or her violation of the rules. However, the Library's rules make clear that the Library is open to the public only for specified purposes: reading, studying, using the Library materials. The Library has not opened its door for the exercise of all First Amendment activities.
 
 
 103
 c. Nature of the forum:
 
 
 104
 Our final inquiry regarding the characterization of the forum concerns its nature and its compatibility with expressive activity for, as the Court observed in Cornelius, "[w]e will not find that a public forum has been created ... when the nature of the property is inconsistent with expressive activity." 473 U.S. at 803, 105 S.Ct. at 3449. Accord, United States v. Kokinda, 110 S.Ct. at 3125 ("If our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control the case.") (Kennedy, J., concurring).
 
 
 105
 A library is "a place dedicated to quiet, to knowledge, and to beauty." Brown v. Louisiana, 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966). Its very purpose is to aid in the acquisition of knowledge through reading, writing and quiet contemplation. Thus, the exercise of other oral and interactive First Amendment activities is antithetical to the nature of the Library. These arguably conflicting characteristics, at least in a First Amendment sense, support our conclusion that the Library constitutes a limited public forum, a sub-category of designated public fora.[21] See Brody v. Spang, at 1118. We thus adopt the reasoning of the United States Court of Appeals for the Second Circuit in Travis v. Owego-Apalachin School District, 927 F.2d 688 (2d Cir.1991), where the court held that a limited public forum "is created when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.... In the case of a limited public forum, constitutional protection is afforded only to expressive activity of a genre similar to those that government has admitted to the limited forum." Id. at 692 (emphasis supplied).[22] Hence, as a limited public forum, the Library is obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the Library as a public forum.[23] Other activities need not be tolerated.
 
 4. Our Judicial Review
 
 106
 The Supreme Court has indicated that restrictions that do not limit those First Amendment activities the government has specifically permitted in the designated public forum need only be "reasonable and 'not an effort to suppress expression merely because public officials oppose the speaker's view.' " Kokinda, 110 S.Ct. at 3121 (quoting Perry, 460 U.S. at 46, 103 S.Ct. at 955). In contrast, time, place or manner regulations that limit permitted First Amendment activities within a designated public forum are constitutional only if they are "narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of information." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). See also Brody v. Spang, at 1121. Significantly, the parties do not contend that any of the challenged regulations purport to restrict First Amendment activities on the basis of content or viewpoint. We examine the challenged rules in sequence applying these standards.
 
 Rule 1:
 
 107
 The district court struck down a rule that provided:
 
 
 108
 Patrons shall be engaged in activities associated with the use of a public library while in the building. Patrons not engaged in reading, studying, or using library materials shall be required to leave the building.
 
 
 109
 By definition, the rule prohibits activities beyond the purpose for which the Library was opened. Accordingly, this rule is subject to the "reasonableness" standard of review.
 
 
 110
 The aim of the rules, as correctly identified by the district court, is "to foster[ ] a quiet and orderly atmosphere ... conducive to every patron's exercise of their constitutionally protected interest in receiving and reading written communications." 765 F.Supp. at 187. Requiring that its patrons make use of the Library in order to be permitted to remain there is a reasonable means to achieve that end. The Library need not be used as a lounge or a shelter. Clearly the rule is reasonable and is perfectly valid.
 
 Rule 5:
 
 111
 The court also enjoined the enforcement of the following rule:
 
 
 112
 Patrons shall respect the rights of other patrons and shall not harass or annoy others through noisy or boisterous activities, by staring at another person with the intent to annoy that person, by following another person about the building with the intent to annoy that person, by playing audio equipment so that others can hear it, by singing or talking loudly to others or in monologues, or by behaving in a manner which reasonably can be expected to disturb other patrons.
 
 
 113
 This rule similarly prohibits behavior that tends to or is disruptive in a library setting. Prohibiting disruptive behavior is perhaps the clearest and most direct way to achieve maximum Library use. Accordingly, we find that this rule is fundamentally reasonable[24] and we reject the attack on it.[25]
 
 Rule 9:
 
 114
 The following portion of the rule, which was invalidated by the district court, requires a closer analysis. It provides:
 
 
 115
 Patrons whose bodily hygiene is offensive so as to constitute a nuisance to other persons shall be required to leave the building.
 
 
 116
 App. at 139.
 
 
 117
 Because this rule would require the expulsion of a patron who might otherwise be peacefully engaged in permissible First Amendment activities within the purposes for which the Library was opened, such as reading, writing or quiet contemplation, we must determine whether the rule is narrowly tailored to serve a significant government interest and whether it leaves ample alternative channels of communication.
 
 
 118
 First, we reiterate, as the Library correctly asserts, that it has a significant interest in ensuring that "all patrons of the [Library] [can] use its facilities to the maximum extent possible during its regularly scheduled hours." Brief at 27 (emphasis supplied). However, we must further ascertain whether the rule governing the attire and personal hygiene of its patrons is narrowly tailored to promote that interest. We note that the "narrowly tailored" requirement does not signify that a rule must be the "least-restrictive or least-intrusive means," of furthering the government's interest. Ward v. Rock Against Racism, 491 U.S. at 798, 109 S.Ct. at 2757. "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " Id. at 799, 109 S.Ct. at 2758 (quoting United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)).
 
 
 119
 We find that the attacked portion of the rule is sufficiently narrow.[26] The Library's goal is served by its requirement that its patrons have non-offensive bodily hygiene, as this rule prohibits one patron from unreasonably interfering with other patrons' use and enjoyment of the Library; it further promotes the Library's interest in maintaining its facilities in a sanitary and attractive condition.[27]
 
 
 120
 Lastly, we find that this rule leaves open alternative channels for communication in the sense that, so long as a patron complies with the rules, he or she may use the Library's facilities. Furthermore, although the Library may eject a patron for violating this rule, we do not read the rule to bar permanently a patron from reentry to the Library once the patron complies with the requirements in the absence of pervasive abuse. In sum, we find that the rule is narrowly tailored to achieve a significant governmental interest, and leaves open ample alternative channels for communication.[28]
 
 
 121
 While the district court was probably correct that the rule may disproportionately affect the homeless who have limited access to bathing facilities, this fact is irrelevant to a facial challenge and further would not justify permitting a would-be patron, with hygiene so offensive that it constitutes a nuisance, to force other patrons to leave the Library, or to inhibit Library employees from performing their duties. Moreover, we do not face the more difficult scenario in which one individual possesses First Amendment rights and others do not. Here, if the First Amendment protects the right to reasonable access to a public library, as we hold it does, this is a right shared equally by all residents of Morristown and Morris Township. See Northeast Women's Center, Inc. v. McMonagle, 868 F.2d 1342, 1349 (3d Cir.1989) (anti-abortion activists' First Amendment right to express their views was not absolute; constitution also protected women's right to abortion), cert. denied, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989). Kreimer's right has no lesser, or greater, significance than that of other residents. Accordingly, his right to reasonable access to the Library cannot be expanded to such an extent that it denies others the same guarantee.
 
 
 122
 In this vein, we also disagree with the district court's assessment that the final unnumbered paragraphs are not narrowly tailored. These two paragraphs merely implement the rule's substantive provisions, by providing that any patron who violates the rules may be expelled. This is not only a reasonable provision, but it is a necessary one to enforce compliance with the substantive provisions.
 
 5. Overbreadth
 
 123
 Kreimer asserts, and the district court held, that in addition to violating the First Amendment, the rules contravene the overbreadth doctrine as expounded by the Supreme Court. The overbreadth doctrine, an exception to conventional standing requirements, provides that an individual whose own conduct may be properly prohibited, may challenge a given regulation "because it also threatens others not before the court--those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985). An analysis of the relevant cases reveals that the district court's determination was in error.[29]
 
 
 124
 In Hoffman Estates v. Flipside, Hoffman Estates, Inc, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), the Supreme Court reiterated that the doctrine of overbreadth is appropriately applied in a facial challenge only where "the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail." Id. at 494, 102 S.Ct. at 1191 (emphasis supplied) (footnote omitted). Because the overbreadth doctrine is " 'strong medicine,' " New York v. Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)), it is to be used sparingly, where the demonstrated overbreadth is considerable. Accord, Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) ("A statute may be invalidated on its face ... only if the overbreadth is 'substantial.' ") (quoting Houston v. Hill, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987)). Accordingly, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Members of Council v. Taxpayers for Vincent, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). We have similarly indicated that, "[i]n order successfully to challenge a statute on the basis of overbreadth ... a litigant must establish something more than a mere possibility that a particular grant of discretion might be used unconstitutionally in some other setting." Gannett Satellite Information Network, Inc. v. Berger, 894 F.2d 61, 66 (3d Cir.1990).
 
 
 125
 We need not dwell long on Kreimer's overbreadth assertions. First, rules 1 and 5 do not reach a substantial amount of activity which would be constitutionally protected in the Library. It is conceivable that one engaged in silent protest, an activity protected under the First Amendment, could be required to cease protesting or leave the Library, but we do not believe that this hypothetical scenario would pose a "realistic danger that the statute ... will significantly compromise First Amendment protections of parties not before the Court." Members of City Council, 466 U.S. at 801, 104 S.Ct. at 2126.[30] Rule 9 places some restrictions on the right to receive information, but as we discuss above, it constitutes a narrowly tailored manner restriction and does not improperly restrict patrons from exercising the constitutionally protected right to receive information.[31]
 
 6. First Amendment Vagueness
 
 126
 Although the "void-for-vagueness" doctrine was originally constructed to invalidate penal statutes that do not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited," Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), courts have transplanted this due process principle into the First Amendment setting. First Amendment vagueness overlaps with, but is distinct from, an overbreadth challenge. Like the overbreadth doctrine, a meritorious First Amendment vagueness challenge will annul an unclear law that "chills" protected First Amendment activities. Hence, a vagueness challenge will succeed when a party does not have actual notice of what activity the statute prohibits. Yet the vagueness doctrine, unlike the overbreadth doctrine, additionally seeks to ensure fair and non-discriminatory application of the laws, thus reflecting its roots in the due process clause. Id. at 357-58, 103 S.Ct. at 1858. Accordingly, it finds repulsive laws that endow officials with undue discretion to determine whether a given activity contravenes the law's mandates. See Fallon, Making Sense of Overbreadth, 100 Yale L.J. 853 (1991). See generally P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart & Wechsler's The Federal Courts And the Federal System, 184-88 (3d Ed.1988).
 
 
 127
 The district court determined that rules 1, 5 and 9 were unconstitutionally vague. In so determining, the court rejected the Library's assertion that the doctrine was inapplicable because the rules were not criminal in nature. The court reasoned that "failure to comply with the policy results in criminal trespass [and] and the policy incorporates the imminent threat of police involvement, presumably to arrest uncooperative patrons pursuant to the criminal trespass law." 765 F.Supp. at 192-93. The difficulty with this conclusion is that a criminal trespass requires a voluntary act distinct from violation of the rules. That a person found in violation of a rule may feel inclined to remain on the property does not thereby transfer the rules into criminal provisions. Nonetheless, the vagueness doctrine is not inapplicable merely because the rules are civil in nature. Instead, as the Court explained in Hoffman Estates, 455 U.S. at 498-99, 102 S.Ct. at 1193:
 
 
 128
 The degree of vagueness that the Constitution tolerates--as well as the relative importance of fair notice and fair enforcement--depends in part on the nature of the enactment.... The Court has ... expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.
 
 
 129
 We accordingly review the rules while keeping in mind that greater tolerance must be accorded civil enactments.
 
 Rule 1:
 
 130
 Rule 1 provides patrons with actual notice that they must use the Library's facilities to remain in the Library. Although the Library officials retain discretion to determine who is making use of the Library materials, this discretion must be exercised in accordance with the criteria in the rules and is thus not unbridled, and we have no reason to suspect that it will be exercised in an unfair manner. The following colloquy which occurred during the summary judgment hearing sheds light on the Library's interpretation of its authority to expel a patron under rule 1:
 
 
 131
 THE COURT: If we take someone who goes to the library and reads a book and closes their eyes to contemplate what they have just read and think about it, is the regulation violated?
 
 
 132
 MR. STARRETT:[32] No, I would say not.
 
 
 133
 THE COURT: Who makes that judgment? Does it depend how long your eyes are closed?
 
 
 134
 MR. STARRETT: Obviously the judgment has to be made by a library employee. I think it depends on the totality of the circumstances in that, if one in fact has a book before him and has been reading it, yes. If one has been in the library for six hours, wandering about and only taking a book off the shelf when the library employee comes by irrespective of what that book may be, obviously not.
 
 
 135
 * * * * * *
 
 
 136
 MR. STARRETT: I think the regulation merely says you must be there for library-related purposes, and then I think as with all situations, whether one is there for a library-related purpose or not has to depend on the totality of the circumstances.... If somebody is sitting there, has no book in front of him, and has been staring into space for an hour or two, and that is not a hypothetical situation, the person can go over as they do and say to that person, 'We don't think you are using the library for library purposes. If you want to read or study or do something, fine. If you are going to just sit here, you are not supposed to do that, and we will have to ask you to leave.'
 
 
 137
 App. at 149-52.
 
 
 138
 The Library's interpretation of its authority under rule 1 dispels any fear that it will act in an unfair or discriminatory manner: the Library agreed that quiet contemplation of Library material constitutes a valid use of the Library; the Library will not immediately expel a patron for violating rule 1, but will inform the patron that he or she must use the Library materials to remain; only those patrons who repeatedly fail to make use of the Library will be required to leave. In addition, we must accord some deference to the Library officials.[33]
 
 Rule 5:
 
 139
 The district court similarly struck down this rule on vagueness grounds, relying in significant part on its determination that "the 'annoyance' standard is 'perfectly vague.' " 765 F.Supp. at 194 (quoting Lawrence H. Tribe, American Constitutional Law § 12-29, at 720-21 (1978)). We disagree.
 
 
 140
 Rule 5 contains two references to "annoyance." The first reference is in the rule's statement that "patrons ... shall not harass or annoy others...." (emphasis supplied). However, the rule does not simply prohibit annoying behavior, but also lists specific behavior that is deemed annoying to others.[34] Hence, this proscription does not require a subjective determination of what might be considered annoying to other patrons.
 
 
 141
 Rule 5 also prohibits "staring at another person with the intent to annoy that person [and] ... following another person about the building with the intent to annoy that person." Again, the rule does not merely proscribe "annoying" behavior; it proscribes staring and following. Annoyance only has significance with regard to the intent of the person staring or following, not the person stared at or followed.[35] Accordingly, the traditional "annoyance" concerns do not exist in this case.
 
 Rule 9:
 
 142
 The district court held that the rule which states, "[p]atrons whose bodily hygiene is offensive as to constitute a nuisance to other persons shall be required to leave the building," was also void for vagueness because "the only indication within the policy as to what constitutes a 'nuisance' is hygiene that 'annoys' others." Moreover, the court held that "[t]he policy neither contains nor refers to identifiable standards, thereby failing to provide adequate notice to potential library patrons." 765 F.Supp. at 194.
 
 
 143
 Although we agree that the "nuisance" standard contained in this rule is broad, in our view it is necessarily so, for it would be impossible to list all the various factual predicates of a nuisance. As Professor Tribe has noted, "in any particular area, the legislature confronts a dilemma: to draft with narrow particularity is to risk nullification by easy invasion of the legislative purpose; to draft with great generality is to risk ensnarement of the innocent in a net designed for others." Lawrence H. Tribe, American Constitutional Law § 12-31, at 1033 (2d 1988) (footnote omitted). In this case, however, the rule's broad sweep is not synonymous with vagueness. The determination of whether a given patron's hygiene constitutes a "nuisance" involves an objective reasonableness test, not an annoyance test. See W. Prosser, Law of Torts § 87 at 577-581 (4th ed. 1971) (defendants conduct constitutes a nuisance only where it is unreasonable under the circumstances and substantially interferes with other interests at stake). Furthermore, the term "nuisance" has long been understood in New Jersey as including "[a]nything that unduly interferes with the exercise of the common right." Mayor & Council of Alpine v. Brewster, 7 N.J. 42, 50, 80 A.2d 297, 300 (1951). Thus, it was appropriate for the Library to craft its rules with regard for the New Jersey law.
 
 D. Equal Protection/Due Process
 
 144
 The district court found that rule 9 violated the Fourteenth Amendment to the United States Constitution in two respects. First, the court held that the policy improperly:makes personal attributes such as appearance, smell, and manner of cleanliness determinative factors in the library staff's enforcement of the policy. Because the library policy's prohibition on offensive hygiene is in no way restricted to instances of actual, material disruptions which are incompatible with the library's function ... the restriction impinges upon individual liberty and sanctions that which may not be sanctioned merely on the basis of 'annoyance.'
 
 
 145
 765 F.Supp. at 195.
 
 
 146
 Because in the district court's view this rule "imping[es] upon individual liberty in an arbitrary and discriminatory manner without cause, justification, or reason," 765 F.Supp. at 195, it held that the rule violated the due process clause. Second, the court determined that, since the Library enacted rules 1, 5 and 9 "with the explicit intention of restricting plaintiff's (and other homeless persons') access to the library," 765 F.Supp. at 195, such action constituted a violation of the equal protection clause.
 
 
 147
 We have already indicated that the district court's determination that the Library may only prohibit conduct that is "actually and materially" disruptive is erroneous. Furthermore, as is evident from our previous discussion, we find that the rules are not arbitrary. In addition, we find that the record is devoid of any facts that support the court's determination that the Library acted with a discriminatory intent. In contrast, the record indicates that the Library enacted these provisions to provide a fair method to expel any disruptive patron, so as to achieve optimum Library use.[36]
 
 E. New Jersey Law
 
 148
 Kreimer's final argument is that the rules violate New Jersey constitutional law. He contends correctly that the states are free to extend more sweeping constitutional guarantees to their citizens than does federal law, as federal constitutional law constitutes the floor, not the ceiling, of constitutional protection. Michigan v. Long, 463 U.S. 1032, 1040, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983). He further correctly points out that New Jersey's free speech and free assembly protections are more far-reaching than their federal counterparts. However, these contentions do not result in a finding that the rules violate the New Jersey Constitution. Although the district court agreed with Kreimer's contention, relying principally upon three decisions to support its analysis, we find that these decisions are readily distinguishable and we predict that the Supreme Court of New Jersey would deem the rules constitutional under state law.[37]
 
 
 149
 In Camarco v. City of Orange, 61 N.J. 463, 295 A.2d 353 (1972), the plaintiff was arrested and charged with loitering in a local parking lot in violation of a city ordinance and brought a declaratory judgment action alleging that the ordinance was unconstitutionally vague. The New Jersey Supreme Court rejected that contention. It held that the Appellate Division of the Superior Court had construed the statute to prohibit "such loitering conduct as clearly will cause an immediate, actual physical violent reaction from any person, which violent reaction will cause a threat to the peace and order of the public," id. at 466, 295 A.2d at 354, and this construction was clearly constitutional. On the basis of the foregoing, the district court determined that "New Jersey law ... requires an actual or imminent disturbance standard." 765 F.Supp. at 197. Two factors render Camarco inapposite. First, the ordinance at issue there was criminal, whereas the rules at issue in this case are purely civil. We have already indicated that civil enactments are reviewed with greater leniency than criminal ones. Second, although the court held that the Appellate Division's construction of the ordinance was constitutional, the court did not intimate that any other construction would have necessarily rendered the ordinance unconstitutional. It simply does not follow that because an ordinance is constitutional as narrowly construed, it would be unconstitutional if broader in scope.
 
 
 150
 Next, in State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980), app. dismissed, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), the defendant, a member of the Labor Party, distributed pamphlets concerning the Labor Party on the campus of Princeton University although he had been forbidden to do so. When university security guards arrested the defendant for violating the university's regulations governing on-campus distribution of materials, he contended that the arrest violated his rights of freedom of speech and expression. In response, the Supreme Court of New Jersey determined that the defendant had a constitutional right to distribute political information on campus which stemmed from the New Jersey Constitution.
 
 
 151
 According to the district court, Schmid "clearly required that a 'reasonable' regulation turn on actual, material disruption." 765 F.Supp. at 197. Schmid does not so hold. Rather, the court in Schmid recognized that persons may enter private property to exercise constitutional rights under certain conditions, provided such entry is consistent with the nature of the property, the nature and extent of the public's invitation to use the property and the purpose of the expressive activity. Id. at 562, 423 A.2d at 630.[38] This holding is obviously immaterial in this case in light of our determination that the Library constitutes a limited public forum. Although the court further stated that "[r]egulations ... devoid of reasonable standards designed to protect both the legitimate interests of the University as an institution of higher education and the individual exercise of expressional freedom cannot constitutionally be invoked to prohibit the otherwise noninjurious and reasonable exercise of such freedoms," id. at 567, 423 A.2d at 632, we have already indicated that the Library rules contain reasonable standards that adequately safeguard the competing interests at stake.
 
 
 152
 Finally, in Uston v. Resorts International Hotel, Inc., 89 N.J. 163, 445 A.2d 370 (1982), the Supreme Court of New Jersey determined that, because a casino had opened up its property to the public, it could not exclude card-counters from its premises as this exclusion is unreasonable. It stated, "when property owners open their premises to the general public in pursuit of their own property interests, they have no right to exclude people unreasonably. On the contrary, they have a duty not to act in an arbitrary or discriminatory manner toward persons who come on their premises." Id. at 173, 445 A.2d at 375. Inasmuch as the card-counter had not disrupted the functioning of any casino operations, and did not threaten its safety, he could not be excluded. Uston has nothing to do with this case, for we have already held that the rules are reasonable and that the Library did not act in an arbitrary or discriminatory manner in enacting them. Furthermore, a violation of the rules would disrupt the smooth functioning of the Library.
 
 III.
 CONCLUSION
 
 153
 The order of May 22, 1991, will be reversed as the rules are not invalid on their face. The case will be remanded to the district court for resolution of the remaining issues and for entry of a partial summary judgment in favor of the Library, upholding the validity of the rules.[39]
 
 SUR PETITION FOR REHEARING
 
 154
 April 21, 1992.
 
 
 155
 PRESENT: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and SEITZ, Circuit Judges.
 
 
 156
 The petition for rehearing filed by the appellee in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 
 [1]
 That section provides that "[a]ny two or more municipalities may unite in the support, maintenance and control of a joint free public library for the use and benefit of the residents of such municipalities."
 
 
 [2]
 N.J.Stat.Ann. § 40:54-9 (West 1991) provides that the Board is to be comprised of:
 seven to nine members, one of whom shall be the mayor or other chief executive officer of the municipality, one of the local superintendents of schools, or in the event that there be no such official, the principal with power of supervision over the local school system, or in case such municipality shall have none of the school officials hereinbefore mentioned, then the president of the board of education, and from five to seven citizens to be appointed by the mayor or chief executive, at least four of who [sic] shall be residents of the municipality.
 
 
 [3]
 We, of course, do not make factual findings on this appeal concerning Kreimer's conduct
 
 
 [4]
 The parties inadvertently cited to a draft version of the rules, and the district court relied on the draft version in rendering its decision. 765 F.Supp. at 184-85. Because the variations between the draft version and the final version are inconsequential, there is no need to remand the case for a re-evaluation by the district court
 
 
 [5]
 Kreimer did not challenge the constitutionality of rule 6 either before the district court or on appeal
 
 
 [6]
 The complaint additionally set forth a libel claim against defendant Rice only, but on May 14, 1991, the parties stipulated to a dismissal of this claim
 
 
 [7]
 On November 21, 1990, Kreimer filed another amended complaint adding the Morristown Police Captain as a defendant
 
 
 [8]
 The district court modified its original order to indicate that it was not invalidating the rules to the extent that they required the wearing of shoes or shirts or barred the playing of audio equipment or talking or singing which disrupts the Library or its occupants
 
 
 [9]
 Although the district court entered an order permanently enjoining the Library from enforcing various rules, it did not employ the traditional balancing test to determine the propriety of the injunction and instead based the order on its conclusion that the rules were unconstitutional. However, we note that the standard of review for injunctions, which is the "abuse of discretion" standard, International Union, United Auto, Aerospace and Agr. Implement Workers of America, UAW v. Mack Trucks, Inc., 820 F.2d 91, 95 (3d Cir.1987), is the same as the one we follow here, for "[a]n abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." Id. (emphasis supplied)
 
 
 [10]
 To place its jurisprudence within a consistent frame, the Court in its later decisions has placed its pre-Perry decisions within Perry's framework
 
 
 [11]
 The Court determined that the CFC itself, though intangible, constituted the "forum" for purposes of the Court's First Amendment analysis. Id., 473 U.S. at 801, 105 S.Ct. at 3448. However, when analyzing the nature of the forum, the Court considered the government's right to control the "federal workplace." Id. at 806, 105 S.Ct. at 3451
 
 
 [12]
 The Court also reiterated that the mere occurrence of expressive activity in a forum does not inexorably lead to the conclusion that the forum is public. Id. at 805, 105 S.Ct. at 3450
 
 
 [13]
 See also Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988) (the government opens a designated public forum where " 'by policy or practice' [it permits] ... 'indiscriminate use by the general public' ... or some segment of the public") (emphasis supplied) (quoting Perry, 460 U.S. at 47, 103 S.Ct. at 956)
 The portent of Kokinda is unclear, as four justices dissented from the determination that the sidewalk did not constitute a public forum, 110 S.Ct. at 3126-33, and Justice Kennedy concurred only in the judgment of the four-justice plurality on the ground that, even if the sidewalk were a public forum, the regulations survived the appropriate level of judicial scrutiny. Id. at 3125-26.
 
 
 [14]
 See footnote 21, infra
 
 
 [15]
 We read the word "traditional" in this phrase as signifying a quintessential forum such as a park, street or sidewalk
 
 
 [16]
 See Gregoire v. Centennial School District, 907 F.2d 1366, 1371 (3d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990)
 
 
 [17]
 This factor distinguishes Kokinda from our case. In Kokinda, the government merely permitted limited First Amendment activities to take place on the sidewalk in front of the post office, whereas here the government intentionally opened the Library for the exercise of specific First Amendment activities
 
 
 [18]
 We do not construe the Court's statements in Perry and Hazelwood School District v. Kuhlmeier, 484 U.S. at 267, 108 S.Ct. at 568, that designated public fora are intentionally opened to "indiscriminate" use by the public to signify that all First Amendment activities must be permitted in any designated public forum. Indeed, the Court's own decisions would undermine this construction as it is unlikely that the Court in Southeastern Promotions, Limited v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, would have required the government to permit speeches and leafleting in the municipal auditorium although it deemed the auditorium to constitute a designated public forum
 
 
 [19]
 In Cornelius, the school's practice was "to require permission from the individual school principal before access to the system to communicate with teachers was granted." 473 U.S. at 803, 105 S.Ct. at 3450
 
 
 [20]
 We could make a more definitive determination concerning the extent of use if, for example, the record included the Library's charter. However, the record is barren of this information, and we are bound to decide the case on the basis of the facts before the district court. We also point out that in its letter of July 14, 1989, to the ACLU-NJ, the Library indicated that access to it was granted "to all." Thus, this is not a case in which the excluded patron was not within the class of persons entitled to use the Library in the first instance, as might have been true in the case of a technical or specialized library. While we are dealing with a facial attack, the parties have supplied some facts and we refer to them
 In any event, a contrary determination concerning the government's retention of discretion would not alter our conclusion in this case, for if the Library is not a designated public forum but is merely a non-public forum, then the rules at issue need only be examined to ensure that they are reasonable and not an effort to suppress a certain viewpoint. See Kokinda, 110 S.Ct. at 3121. We thus do not confront a situation such as that recently before us in Brody v. Spang, in which the record was inadequate for a determination of the character of the forum so that a remand was required.
 
 
 [21]
 While we find the "limited" public forum doctrine to be a useful analytical concept, we would reach the same conclusion simply following the Supreme Court's declarations regarding "designated" public fora. It is clear that the Court's decisions recognize that a government does not open a forum for the exercise of all First Amendment activities merely because it has opened the forum to the public for the exercise of certain specified First Amendment activities. See Perry, 460 U.S. at 45 n. 7, 103 S.Ct. at 955 n. 7 ("A public forum may be created for a limited purpose....") Indeed, the Court itself, without focusing on the analytical distinction between "designated" and "unlimited" public fora as developed here, has used the words interchangeably
 The identification of a sub-category of designated public fora reflects the flexible approach the Supreme Court has recommended, and minimizes the risk of a wooden and mechanistic application of the public forum labels.
 
 
 [22]
 The Library relies on the following decisions to support its contention that the Library is not a designated public forum, but they are readily distinguishable. First, in Adderley v. Florida, 385 U.S. 39, 41, 87 S.Ct. 242, 244, 17 L.Ed.2d 149 (1966), the Court held that the arrests and subsequent convictions of student demonstrators for trespass with malicious and mischievous intent, arising from their entry into jail grounds and obstruction of vehicular traffic to a jail entrance, did not violate the students' First Amendment rights. The Court determined that a jail did not constitute a public forum, traditional or otherwise, for "[j]ails, built for security purposes," are not open to the public. Accord, Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prison is not a public forum). Clearly, a jail, unlike a public library, is not opened to the public to promote the exercise of First Amendment activities
 In Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Court similarly determined that advertising space on vehicles of a city transit system was not a public forum for in this context "the city is engaged in commerce.... The car card space, although incidental to the provision of public transportation, is part of the commercial venture." Id. at 303, 94 S.Ct. at 2717. A free public library, in contrast, is not a commercial venture.
 Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), addressed whether military regulations that prohibit partisan political speeches and the distribution of literature without prior approval within the reservation violated the First Amendment. The Court concluded that the regulations did not, for "[a] necessary concomitant of the basic function of a military installation has been 'the historically unquestioned power of [its] commanding officer summarily to exclude civilians from the area of his command ...' The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is thus historically and constitutionally false." Id. at 838, 96 S.Ct. at 1217. Again, a public library is specifically dedicated to the exercise of certain First Amendment activities, unlike a military reservation.
 The Court's decision in United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981), is also consistent with our view that the Library constitutes a limited public forum. The Court there held that a letterbox should not be treated any differently for First Amendment purposes than a military base, prison or advertising space on mass transit vehicles. In the Court's view, the purpose of mailboxes was to ensure the "maintenance of a nationwide system for the safe and efficient delivery of mail," id. at 130, 101 S.Ct. at 2685, and uses which were incompatible with that purpose could be constitutionally prohibited. Here the Library's very purpose is to facilitate the receipt of information; the use of the Library for the exercise of the right to receive information is necessarily not incompatible with that purpose.
 
 
 [23]
 We further note that our determination is consistent with International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority, 691 F.2d 155, 160 (3d Cir.1982) (indicating in dictum that a public library is a limited public forum under Brown v. Louisiana, 383 U.S. at 131, 86 S.Ct. at 719) and Concerned Women for America, Inc. v. Lafayette County, 883 F.2d 32, 34 (5th Cir.1989) (district court's injunction based on its determination that public library constituted a public forum was not abuse of discretion). We thus question the conclusion reached by the district court in AFSCME Local 2477 v. Billington, 740 F.Supp. 1, 7 (D.D.C.1990)
 
 
 [24]
 While we find rules 1 and 5 valid under the reasonableness test which we employ in light of our conclusion that the restrictions are not aimed at activities which the government has specifically permitted in the Library--a limited public forum--we note as well that, to a large extent, the rules regulate non-expressive activity (i.e., activity not protected under the First Amendment). Regardless of the nature of the forum, the First Amendment does not prohibit regulation of non-expressive activity unless the regulation "impose[s] a disproportionate burden upon those engaged in protected First Amendment activities." Arcara v. Cloud Books, Inc., 478 U.S. 697, 704-05, 106 S.Ct. 3172, 3176, 92 L.Ed.2d 568 (1986). However, we need not determine the extent to which these rules regulate expressive activity or impose a disproportionate burden inasmuch as we conclude that the regulations are entirely reasonable
 
 
 [25]
 In addition to finding the rules valid under the reasonableness test we are applying, we disagree with the district court's statement that, under Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, and Grayned v. Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Library may only enact time, place and manner restrictions on activity that "actually and materially interferes with the peaceful and orderly management of the public space." 765 F.Supp. at 188
 In Tinker, three students were suspended under a school ordinance that prohibited the wearing of black armbands in opposition to the Vietnam War. The Supreme Court held that this ordinance, which amounted to a "prohibition of a particular expression," 393 U.S. at 509, 89 S.Ct. at 738 (emphasis added), violated the students' constitutional rights to free speech, and although the Court recognized that school officials had authority to regulate behavior in the school, the Court found that there was no "reason to anticipate that the wearing of armbands would substantially interfere with the work of the school or impinge upon the rights of others." 393 U.S. at 509, 89 S.Ct. at 738. In contrast, the Library logbook contains a multitude of references detailing the alleged disruption that occurs when certain patrons choose not to use the Library materials while they remain in the Library. Thus, from its viewpoint it was reasonable for the Board to forecast that actual disruption would occur. In addition, Tinker involved an attempted suppression of symbolic political speech based on the content of that speech. The Supreme Court has recognized that such regulations are subjected to the strictest scrutiny. Federal Election Commission v. National Conservative Political Action Committee, 470 U.S. 480, 493, 105 S.Ct. 1459, 1466, 84 L.Ed.2d 455 (1985). There is no evidence to support a similar attempt on the part of the Library officials. Finally, the Court in Tinker recognized that "personal intercommunication among the students," id., 393 U.S. at 512, 89 S.Ct. at 739, constituted an important part of a student's education. However, interactive communication is not an important part of the intended use of the Library; indeed, it is contrary to its smooth functioning. The Court's observation in Tinker that First Amendment activities that are "incompatible" with the nature of the public forum may be prohibited supports our conclusion.
 In Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, the Court upheld a criminal regulation prohibiting a person on public grounds or private grounds adjoining a school from wilfully assisting or making noise that "disturbs or tends to disturb the peace or good order...." Id. at 107-08, 92 S.Ct. at 2298 (emphasis supplied). This determination also supports our conclusion that the disturbance need not be actual. Further, inasmuch as the Court interpreted the regulation to prohibit behavior that would imminently interfere with normal school activities based on its review of state court decisions interpreting similar statutes, we note that the rules at issue in this case are civil, and do not require the same degree of precision.
 Finally, we reiterate that the Library is a limited designated public forum. The Library need only permit use of its facilities which is consistent with the intent of the government when opening this forum to the public. Even within the scope of these consistent uses, it seems obvious that the Library may regulate conduct protected under the First Amendment which does not actually disrupt the Library. For example, we do not doubt that a Library may limit the number of books which a patron may borrow from it at any time, even though no request has been made by another patron for the book which the patron at his or her borrowing limit desires to withdraw. Similarly we do not doubt that the Library may limit the length of time during which a book may be borrowed. Indeed, the district court itself implicitly acknowledged this point when it modified its order so that it did not invalidate the rule requiring the wearing of shoes, since it can hardly be imagined that a person simply by being barefoot would disrupt the Library.
 We further reject the district court's intimation that the rules would prohibit the wearing of an armband for political purposes. It is clear to us that, so long as the patron is engaged in the peaceful and non-disruptive use of the Library, the adornment of an armband is irrelevant.
 
 
 [26]
 Our discussion of rule 9 with regard to the vagueness issue below is relevant here as well
 
 
 [27]
 See Clark v. Community for Creative Non-Violence, 468 U.S. at 296, 104 S.Ct. at 3070 (validating a park regulation which was intended to require users to "maintain[ ] the parks ... in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence")
 
 
 [28]
 Kreimer, in contrast, asserts that, because the rules "are aimed at behavior that merely 'annoys' other persons'[ ] subjective sensibilities ... [and] does not condition exclusion upon actual or imminent disruption or disturbance as a result of such behavior or hygiene," it does not reasonably effectuate its goals. We do not share his view for two reasons. First, we have already noted that the Library is not confined to prohibiting behavior that is actually disruptive. Additionally, rule 9 does prohibit behavior that is actually disruptive, for the offensive nature of the patron's bodily hygiene must rise to the level of a nuisance before the patron may be expelled from the Library
 
 
 [29]
 The district court did find that the provision prohibiting the playing of audio equipment in the Library did not violate the overbreadth doctrine. 765 F.Supp. at 192
 
 
 [30]
 The district court relied heavily and, in our view, improperly, on the Supreme Court's decision in Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), to hold that rule 1 contravenes the overbreadth doctrine. In Brown, five black men were charged with violating a breach of the peace statute for refusing to leave the reading room of a public library when asked to do so. These men remained in the library to peacefully protest the library's unequal treatment of blacks. In reversing their convictions, the Court held that their behavior, which included "staring vacantly," id. at 140, 86 S.Ct. at 723, did not constitute a breach of the peace. However, the Court was quick to point out that "the circumstances here were such that no claim can be made that use of the library by others was disturbed by the demonstration.... Were it otherwise, a factor not present in this case would have to be considered. Here, there was no disturbance of others, no disruption of library activities, and no violation of any library regulations." Id. at 142, 86 S.Ct. at 724 (emphasis supplied). Justice White, concurring in the result, underscored the library's authority to promulgate and enforce regulations that could, in his view, constitutionally prohibit the activities engaged in by petitioners. He wrote:
 Were it clear from this record that lingering in a public library for 10 minutes after ordering a wanted book contravened some explicit statute, ordinance, or library regulation of general application, or even if it were reasonably clear that a 10-minute interlude between receiving service and departure exceeded what is generally contemplated as a normal use of a public library, I would have difficulty joining in a reversal of this case.... Nor would I deem the First Amendment to forbid a municipal regulation limiting loafing in library reading rooms.
 Id. at 149, 86 S.Ct. at 728.
 We are faced with a different factual situation. First, the plurality in Brown did not even discuss the overbreadth doctrine, let alone decide the case on that basis. Second, the Library has promulgated and attempted to enforce a rule that specifically requires that patrons use the Library materials while they remain in the Library. We agree with Justice White that the First Amendment does not prohibit this slight restriction. The same logic holds true with respect to rule 5.
 
 
 [31]
 The district court did not discuss whether rule 9 violated the overbreadth doctrine
 
 
 [32]
 Mr. Starrett is the Library's counsel
 
 
 [33]
 We note that our interpretation is consistent with that of Justice White, who stated that a public library could properly proscribe "loafing," or other non-"normal" library activities. Brown, 383 U.S. at 149, 86 S.Ct. at 728 (White, J., concurring)
 
 
 [34]
 In this respect, the rule is vastly different than the one considered by the Court in Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), which prohibited people from behaving "in a manner annoying to persons passing by." Id. at 611, 91 S.Ct. at 1687
 
 
 [35]
 Finally, although the district court did not specifically address this provision, we hold that the prohibition of behavior which "reasonably can be expected to disturb other persons," is not vague and does not endow Library personnel with undue discretion. In contrast to the purely subjective standard at issue in Coates, this rule prohibits behavior which reasonably--i.e., objectively--could result in the disturbance of others
 
 
 [36]
 Further, in any event, as the homeless do not constitute a suspect class, the rules need only survive the lowest standard of review for equal protection purposes. Our previous discussion forecloses any serious contention that they do not pass muster under this standard
 
 
 [37]
 Although the Supreme Court of New Jersey has observed that "[t]he constitutional pronouncements, more sweeping in scope than the language of the First Amendment, were incorporated into the organic law of this State with the adoption of the 1844 Constitution," State v. Schmid, 84 N.J. 535, 557, 423 A.2d 615, 626-27 (1980) (footnote omitted), app. dismissed, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), the State's expanded free speech and assembly protection lies in its citizens' right to entry of private property that has been opened to the public. We do not think that the Supreme Court of New Jersey would reject the analysis we have made with respect to the use of public property
 
 
 [38]
 This analysis is similar to that in Perry and Cornelius. There is no reason to believe that the New Jersey Supreme Court would reach a different conclusion than ours based on the same criteria
 
 
 [39]
 On February 28, 1992, a stipulation of dismissal of certain of the damage claims in this action was filed in the district court and it has been forwarded to this court. We have examined the stipulation and have concluded that it does not affect the issues on this appeal. Apparently the parties are of the same view, as none has moved to dismiss the appeal or suggested that this appeal is now settled or is moot